**NORTH SLOPE BOROUGH et al.**

v.

**Cecil D. ANDRUS, Secretary of the Department of the Interior, et al.**

**Atlantic Richfield Company et al., Intervenors, Appellants.**

**NATIONAL WILDLIFE FEDERATION et al.**

v.

**Cecil D. ANDRUS, Secretary of the Department of the Interior, et al.**

**Atlantic Richfield Company et al., Intervenors, Appellants.**

**VILLAGE OF KAKTOVIK et al.**

v.

**Cecil D. ANDRUS, Secretary of the Department of the Interior, et al.**

**Atlantic Richfield Company et al., Intervenors, Appellants.**

**NORTH SLOPE BOROUGH et al., Appellants,**

v.

**Cecil D. ANDRUS, Secretary of the Department of the Interior, et al.**

**NATIONAL WILDLIFE FEDERATION et al., Appellants,**

v.

**Cecil D. ANDRUS, Secretary of the Department of the Interior, et al.**

**VILLAGE OF KAKTOVIK et al., Appellants,**

v.

**Cecil D. ANDRUS, Secretary of the Department of the Interior, et al.**

**NORTH SLOPE BOROUGH et al.**

v.

**Cecil D. ANDRUS, Secretary of the Department of the Interior, Richard Frank, Administrator of the National Oceanic and Atmospheric Administration, Appellants,**

**Atlantic Richfield Co. et al., Intervenors.**

---

**80.** Brief for Appellees at 14.  **81.** Id.

**590**

NATIONAL WILDLIFE FEDERATION
et al.

v.

Cecil D. ANDRUS, Secretary of the Department of the Interior, Richard A. Frank, Administrator of the National Oceanic and Atmospheric Administration, Appellants,

Atlantic Richfield Company et al., Intervenors.

VILLAGE OF KAKTOVIK et al.

v.

Cecil D. ANDRUS, Secretary of the Department of the Interior, Richard Frank, Administrator of the National Oceanic and Atmospheric Administration, Appellants,

Atlantic Richfield Company et al., Intervenors.

Nos. 80–1148, 80–1150, 80–1151, 80–1164, 80–1169, 80–1184 and 80–1190 to 80–1192.

United States Court of Appeals, District of Columbia Circuit.

Argued 15 May 1980.

Decided 9 Oct. 1980.

Rehearing Denied 19 Nov. 1980.

591

Bruce J. Terris, Washington, D. C., with whom Edward Comer and James M. Hecker, Washington, D. C., were on the brief for North Slope Borough, et al., cross–appellants in No. 80–1164 and appellee in Nos. 80–1148, 80–1150, 80–1151, 80–1169, 80–1184, 80–1190, 80–1191 and 80–1192.

Clifton E. Curtis, Washington, D. C., with whom James N. Barnes, Leonard C. Meeker, Washington, D. C., Michael I. Jeffery

and Donald E. Clocksin, were on the brief for Village of Kaktovik, et al., cross–appellant in No. 80–1184 and appellees in Nos. 80–1148, 80–1150, 80–1151, 80–1164, 80–1169, 80–1190, 80–1191 and 80–1192.

Patrick A. Parenteau, Washington, D. C., with whom Thomas G. Tomasello, Washington, D. C., was on the brief for National Wildlife Federation, et al., appellant in No. 80–1169 and cross–appellees in Nos. 80–1148, 80–1150, 80–1151, 80–1164, 80–1184, 80–1190, 80–1191 and 80–1192.

Kathryn A. Oberly, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., Lois J. Schiffer, Bruce C. Rashkow and Margaret Strand, Attys., Dept. of Justice, Washington, D. C., were on the brief for federal appellee, in Nos. 80–1148, 80–1150, 80–1151, 80–1164, 80–1169 and 80–1184 and cross–appellants in Nos. 80–1190, 80–1191 and 80–1192.

E. Edward Bruce, Washington, D. C., with whom John T. Smith II, Constance J. Chatwood, David K. Flynn, Washington, D. C., Owen Olpin, Neil M. Soltman, and Burton H. Thompson, Los Angeles, Cal., were on the brief for appellants in Nos. 80–1148, 80–1150 and 80–1151 and cross–appellees in Nos. 80–1164, 80–1169, 80–1184, 80–1190, 80–1191 and 80–1192.

Avrum M. Gross, Atty. Gen., State of Alaska, Juneau, Alaska, pro hac vice by special leave of the Court, with whom Robert M. Maynard, Asst. Atty. Gen., State of Alaska, Juneau, Alaska, and Robert H. Loeffler, Washington, D. C. and Alan Cope Johnston, San Francisco, Cal., were on the brief for amicus curiae urging reversal in Nos. 80–1148, 80–1150, 80–1151, 80–1164, 80–1169, 80–1184, 80–1190, 80–1191 and 80–1192.

E. Edward Bruce and Constance J. Chatwood, Washington, D. C., also entered appearances for intervenor in Nos. 80–1148, 80–1150, 80–1151, 80–1164, 80–1169, 80–1184, 80–1190, 80–1191 and 80–1192.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

Before MacKINNON and WILKEY, Circuit Judges, and PENN *, United States District Judge for the United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Plaintiffs, who represent collectively environmental organizations and native Alaskans, brought actions in district court to enjoin the Secretary of Interior from carrying out a lease sale of federal properties with oil and gas potential off the north coast of Alaska in the Beaufort Sea. The district court held that the Secretary failed to comply with certain requirements of the National Environmental Policy Act (NEPA)[1] and the Endangered Species Act (ESA),[2] though ruling for the government on all other statutory claims. District Judge Aubrey Robinson, Jr. enjoined the Secretary from accepting any of the bids submitted at the lease sale already held, and also enjoined all activity on the tracts until a new and adequate Environmental Impact Statement (EIS) was submitted and a "biological opinion" prepared in accordance with ESA.

For reasons discussed below, we affirm in part and reverse in part and hold that the Secretary may undertake, and permit to be undertaken, all lawful activities attendant upon the "lease phase" of the Beaufort Sea oil and gas project. On 8 July 1980 we so ordered, and thus cleared the way for the Secretary to accept bids. The Secretary has done so, we understand, and the Beaufort Sea leases have been executed and issued.

## I. THE SETTING

### A. The Environment

As early as November 1974 the Bureau of Land Management (BLM) of the Department of Interior proposed a lease sale for

1. 42 U.S.C. § 4321 et seq. (1976).

2. 16 U.S.C. § 1531 et seq. (1976).

the development of oil and gas properties in the Beaufort Sea, the near–shore portion of the Arctic Ocean beginning at Point Barrow and running east into Canada beyond the delta of the Mackenzie River. The Beaufort Sea oil and gas tracts are near both the Prudhoe Bay oil field and the northern terminus of the TransAlaska Pipeline.

The environment of the Beaufort Sea region is dark and hostile; frigid temperatures prevail throughout much of the year. The frozen winter sea opens during the spring ice breakup, setting off powerful floes threatening everything in their path. Its precarious environment means the resources of the Beaufort Sea will doubtless prove difficult to assay, develop and protect. Life is nasty, brutish, and sometimes short.

While its potential oil reserves are the mainspring of industry and governmental interests, the area is home or migratory home to various animal species as well as a tribe of Eskimoes, the Inupiats. Although various species, and the ecosystem generally may be affected, it is the Bowhead whale (*Balaena mysticetus*) which is really the principal focus of environmental and native concerns. The Bowheads migrate through the Beaufort Sea in the spring and autumn on their back–and–forth route from the Bering Sea to the Canadian Arctic. These whales are in jeopardy of extinction[3] and thus fall under the special protection of ESA. The possibility of oil spills along with an increase in human and construction activity in the area pose a danger to the Bowhead which is real, but hard to quantify.

The Inupiat tribe depends on these whales. Harvesting a restricted number of Bowhead for food comprises the important part of the Inupiat's subsistence lifestyle. Their culture to a significant extent revolves around whaling, the hunt for the Bowhead in particular. If the Bowhead disappears, the distinctive mores of the Inupiat, it is claimed, will also suffer. This, plaintiffs argue, would violate the trust responsibility which they allege the federal government must shoulder in favor of the native peoples of the United States.

These considerations, sketched only briefly here, are the factors which the Secretary must weigh alongside of the nation's plain need to develop domestic oil capacity. The balancing, of course, is the Secretary's responsibility, to be carried out according to the guidelines and principles established by Congress. We hold the Secretary's actions here were manifestly responsible and do effectuate the will of the legislature.

### B.   The Lease Stage

It is important to consider first what has *not* happened in, around, or affecting the Beaufort Sea: there has been no drilling—not even of an exploratory nature only—for oil, nor is it imminent. Drilling may still be at least two years away and will remain subject both to routine and extraordinary administrative and judicial review.[4] As provided in the Outer Continental Shelf Lands Act (OCSLA),[5] the *lease sale itself is only a preliminary and relatively self–contained stage within an overall oil and gas development program which requires substantive approval and review prior to implementation of each of the major stages: leasing, exploring, producing.*

At this point the court must look at the contentions among the parties as pertaining only to the lease sale. The leasing of tracts is the limited subject–matter to which our decision is relevant. This sale was in a suspended state after Judge Robinson's Order of 22 January 1980 enjoining the Secretary from leasing any of the tracts. The bids themselves, totalling $1.086 billion, were submitted to the Secretary at a lease sale held on 11 December 1979. When this

---

**3.**  *See* Administrative Record/Department of Interior (AR/DOI), Exhibit III–5, *reprinted in* Joint Appendix (J.A.) at 295–312; *Hopson v. Kreps*, 462 F.Supp. 1374, 1376 & n.3 (D.Alaska 1979).

**4.**  *See* notes 100–03 and accompanying text *infra.*

**5.**  43 U.S.C. § 1331 *et seq.* (1976).

action was begun, no bids had been accepted by the Secretary and no leases had been executed.[6] Once the Secretary accepts "high" bids and executes leases, lessees are permitted by federal law, Department regulations and lease stipulations to engage only in "preliminary activities." Basically, these permissible activities fall under the broad rubric of "testing." "[G]eological, geophysical, and other surveys necessary to develop a comprehensive exploration plan" are allowed.[7] Some construction of "test" structures will also be necessary in due time—and is required by the Secretary—in order to ascertain what it will take for drilling rigs and platforms to withstand the rigors of the Arctic winter. However, no "physical penetration of the seabed of greater than 300 feet of unconsolidated formations, or 50 feet of consolidated formations" would constitute a permissible preliminary activity.[8] Lessees are required to notify the Area Oil and Gas Supervisor before conducting even these limited activities. It is apparent, then, that the situation in the Beaufort Sea can hardly spiral out of the Secretary's guidance and ongoing control now that "high" bids have been accepted and the lease stage is fully underway.

The lease stage provides the lessees and the Secretary with a chance to amass data which will inform future proposals and decisions. For example, seismic and sonar testing as well as bottom and core sampling might be absolutely essential for the lessees' decision regarding the appropriate commitment of their resources in light of the area's development potential. Similarly, the data generated by testing activity will also permit the Secretary to exercise informed judgment in balancing the dual public interests of protecting the environment and enhancing oil—production capacity.

It is manifest, then, that it was proper for the lease sale to go forward. Without the execution of these leases and the resulting authorized activity, there could be no intelligent appraisal of the proper course for the Beaufort Sea. The congressional mandate establishes a clear program for thoughtful, graduated, and tightly controlled development of oil lands on the outer continental shelf of the United States. The agency actions under review here indicate that the leasing of prospective oil and gas tracts is clearly "in control"; any concern that the oil company lessees might barrel ahead precipitously is mitigated by intricate constraints imposed by Congress and the Secretary, and enforced carefully by the Secretary. We discuss those constraints now.

## C. Restraints on Possible Environmental Damage

There are various federal statutes which require continuing review of all activity growing out of these leases. This legislation authorizes the Secretary to order a cessation to such activities if environmental safety cannot be ensured. Through numerous specific lease stipulations as well as an "Information to Lessees" the Secretary has provided for controlled development of the Beaufort Sea tracts.

### 1. Legislation

ESA, OCSLA, and the Marine Mammal Protection Act (MMPA)[9] all authorize the Secretary to judge activities taking place under the leases on an ongoing basis and to suspend any such activity which jeopardizes the environment. Naturally, strictures placed in these statutes for the environment's protection will condition the lessees' rights as well as the obligations of the Secretary.[10] The Secretary and the lessees continue subject to the requirements of substantive environmental legislation (e. g., ESA, MMPA, etc.) after the lease sale has

---

6. The Atlantic Richfield Company and other "high" bidders intervened in this action as defendants.

7. 44 Fed.Reg. 70238 (6 Dec. 1979).

8. Id.

9. 16 U.S.C. § 1361 et seq. (1976).

10. See Conservation Law Foundation v. Andrus, 623 F.2d 712 (1st Cir. 1979).

been consummated. It is quite clear that "strictures of the ESA [and other laws] apply to Lease applicants as well as the government."[11] Plainly, the lessees will not be unrestrainedly "on their own" in the lease related activity which they undertake.

A perfect example of the future oriented features of the Secretary's ongoing responsibility to protect the environment can be found in OCSLA's requirement of the use of Best Available and Safest Technologies (BAST).[12] The statute instructs the Secretary to order the use of BAST by lessees where economically feasible and justified after weighing potential effects on the environment. These BAST regulations are lawfully and most sensibly promulgated by the Secretary at some point *after* the lease sale has taken place. In the words of the First Circuit: "[T]he statutory scheme providing for retroactive application of BAST regulations indicates that the Secretary's duty to develop the regulations is an ongoing process which allows for flexible, changing standards as the available technology evolves."[13]

The Secretary and the lessees are obligated to reconcile future activities with the laws expressing environmental standards. In the instant appeal, ESA, as noted above, provides for a suspension of activities at such time when operations threaten the continued existence of any endangered species or its habitat.[14] MMPA also requires the Secretary (and/or the Secretary of Commerce) to prevent harm to protected wildlife. If the lessee's operations become prejudicial to wildlife, the Secretary must seek to halt those activities by suing to enjoin or prosecute for a "taking."[15]

OCSLA, too, contemplates future consideration by the Secretary of environmental problems developing after the lease sale. In fact, a purpose of OCSLA is to permit an expedient resolution of preliminary matters in the development of oil lands while preserving administrative and judicial review for future times when potential threats to the environment are readily visualized and evaluated. The 1978 amendments to OCSLA which authorize the Secretary to suspend activities on a lease if "continued activity ... would ... cause harm ... [to marine life or environment]"[16] must be taken seriously. The congressional intent to facilitate these lease sales, and to save until concrete a significant portion of substantive environmental determinations, compels this court to sanction the lease sale with confidence that environmental safeguards persist.[17]

### 2. Lease Stipulations

In order to minimize possible injury to the environment, the Secretary has drafted various lease stipulations which circumscribe activities permitted to the lessees. These stipulations represent part of the Secretary's attempt to protect wildlife from the outset; as demonstrated in the preceding subsection, federal law authorizes the Secretary to impose subsequent restrictions on the lessees as the need arises.

These stipulations are announced in the "final notice of sale for the proposed joint Federal/State Beaufort Sea lease sale" as

11. *Id. See also* notes 120–21, 140 & accompanying text *infra.*

12. 43 U.S.C. § 1347(b) (Supp. II 1978). *See* notes 160–61 & accompanying text *infra.*

13. *Conservation Law Foundation v. Andrus,* 623 F.2d 712 (1st Cir. 1979).

14. 16 U.S.C. § 1536 (Supp. II 1978).

15. 16 U.S.C. §§ 1372, 1538 (1976).

16. Pub.L. No. 95–372, 92 Stat. 629 (1978), 43 U.S.C. § 1334. *See* H.R.Rep.No. 590, 95th Cong., 1st Sess. 53–55 (1977), *reprinted in* [1978] U.S.Code Cong. & Ad.News 1450, 1460–62.

17. OCSLA "will expedite the systematic development of the [outer continental shelf], while protecting our marine and coastal environment .... The basic purpose of H.R. 1614 is to promote the swift, orderly and efficient exploitation of our almost untapped domestic oil and gas resources in the Outer Continental Shelf." *Id.* at 53, *reprinted in* [1978] U.S.Code Cong. & Ad.News at 1460.

published in the *Federal Register*.[18] In all, there are thirteen stipulations to be applied to federal lessees. Some stipulations address issues like discovery by lessees of any sites or objects of "historic or archaeolgic significance," [19] or the prohibited disposal of solid wastes on artificial islands or in marine waters.[20] Two lease stipulations clearly reflect general concern for the exigencies of a sensitive environment:

*Federal Stipulation No. 2*

The lessee shall include in any exploration and/or development plans a proposed environmental training program for all personnel involved in exploration or development activities (including personnel of the lessee's contractors and subcontractors) for review and approval by the [Alaska Area Oil and Gas] Supervisor [of the Geological Survey].[21]

\* \* \* \* \* \*

*Federal Stipulation No. 7*

If biological populations or habitats which may require additional protection are identified by the Supervisor on any tracts in the leasing area, the Supervisor will require the lessee to conduct environmental surveys, as approved by the Supervisor, to determine the extent and composition of biological populations or habitats, and the effects of proposed or existing operations on the populations or habitats which might require additional protective measures. . . .

Based on any surveys which the Supervisor may require of the lessee, or other information available to the Supervisor on special biological resources, the Supervisor may require the lessee to: . . . (4) modify operations in such a way as not to affect adversely the significant biological populations or habitats deserving protection.[22]

Specific measures designed to mitigate possible harm to the environment are included as well among the lease stipulations. *Federal Stipulations Nos.* 6 and 8 [23] control the discharge of drilling muds and waters, and limit, for two years, all drilling activity to the period 1 November to 31 March. Both these provisions are intended to ensure, as much as possible, the continued prosperity of marine life in the area.

### 3. Information to Lessees

The Secretary has made clear to the lessees that their environmental obligations are more stringent than provided for in the four corners of the leases themselves. The Final Notice of Sale [24] underscores the existence of additional obligations that bind the lessees, as promulgated in the section entitled "Information to Lessees." [25] The lessees are advised therein that, for example:

All lease activities and structures shall be scheduled and/or designed to allow free movement and safe passage to fish and mammals, both onshore and offshore.

. . . . .

Winter removal of fresh water or snow cover from rivers and natural lakes which support overwintering fish is prohibited by State laws.

. . . . .

Surface use will be controlled, as necessary to prevent unreasonable conflicts with local subsistence harvests.

. . . . .

Bidders are advised that during the conduct of all activities related to leases issued as a result of this lease sale, the

---

18. 44 Fed.Reg. 64752, 64761–63 (7 Nov. 1979), *reprinted in* J.A. at 488, 497–99.

19. *Federal Stipulation No. 1*, 44 Fed.Reg. at 64671, *reprinted in* J.A. at 497.

20. *Federal Stipulation No. 4*, 44 Fed.Reg. at 64761, *reprinted in* J.A. at 497.

21. 44 Fed.Reg. at 64761, *reprinted in* J.A. at 497.

22. 44 Fed.Reg. at 64762, *reprinted in* J.A. at 498.

23. *Id.*

24. *See* note 18 *supra*.

25. 44 Fed.Reg. at 64766–70, *reprinted in* J.A. at 502 06.

lessee and its agents, contractors and sub-contractors will be subject to the provisions of the Marine Mammal Protection Act of 1972 and International Treaties.

. . . . .

In the enforcement of Stipulation No. 3, 6, and 7, the Supervisor will receive recommendations from a biological task force composed of designated representatives of the Bureau of Land Management, U.S. Fish and Wildlife Service, U.S. Geological Survey, the National Marine Fisheries Service, the Environmental Protection Agency, and the State Departments of Fish and Game, Environmental Conservation, and Natural Resources.[26]

Another significant announcement in the "Information to Lessees" is in the nature of requiring advance testing of drilling structures prior to the actual deployment of operating wells in treacherous waters:

Drilling from platforms or structures located beyond the barrier islands in water depths in excess of 13 meters will be prohibited until such time as a test platform or structure of the same type to be drilled from has been in existence in the sale area at a depth in excess of 13 meters for a period of two winter seasons. Verification of the test structure will be required in accordance with the Geological Survey Platform Verification Program. The Supervisor will determine the adequacy of the test structure after consultation with designated representatives of the North Slope Borough and the Regional Technical Working Group of the National Outer Continental Shelf Advisory Board prior to approving drilling operations from the test structure or from platforms or structures of the same type in water depths in excess of 13 meters.[27]

Plainly, the imposition of a drilling moratorium during which time replicas of the structures planned for deep water use are measured against the region's actual conditions bespeaks sensitivity for the particular environmental needs of the Beaufort Sea. There is no question that the frigid arctic temperatures and the powerful movements of ice sheets make for great danger in the area requiring careful preparations and special measures. The Secretary has responded thoughtfully in reconciling the quest for oil with meaningful deference to nature. This, the accommodation of two social objectives, is the national policy as willed by Congress.[28]

We now turn to a specific discussion of the district court opinion and the statutes implicated therein.

## II. ACTION IN THE DISTRICT COURT AND COURT OF APPEALS

In November 1979 the North Slope Borough, et al., the National Wildlife Federation, et al., and the Village of Kaktovik, et al., filed suit in the district court against the Secretary of Interior to enjoin the sale of oil and gas leases in the Beaufort Sea. Representatives of the oil and gas industry intervened as defendants, and the State of Alaska appeared as amicus curiae. On 7 December 1979 the district court denied the plaintiffs' petition for a preliminary injunction to stop the lease sale.[29] The court expressed its view that plaintiffs were substantially likely to prevail on the merits, but that preliminary relief was unnecessary as the threat of "irreparable harm" had not been demonstrated.[30]

After expedited consideration of the merits and hearing oral arguments on cross-motions for summary judgment, the district court issued its Memorandum Opinion and Order on 22 January 1980 in North Slope Borough v. Andrus.[31] Summary judgment was granted in favor of the Secretary and

**26.** 44 Fed.Reg. at 64767, reprinted in J.A. at 503.

**27.** 44 Fed.Reg. at 64767, reprinted in J.A. at 503.

**28.** See notes 16 & 17 supra.

**29.** North Slope Borough v. Andrus, 486 F.Supp. 326 (D.D.C.1979) [hereinafter North Slope Borough].

**30.** Id. at 330.

**31.** 486 F.Supp. 332 (D.D.C.1980).

other federal parties and intervenors on numerous statutory claims, but the court enjoined the consummation of the lease sale nevertheless, basically because of conclusions: first, the EIS was flawed therefore "NEPA require[d] that the pre–lease sale *status quo* be maintained"; second, the "biological opinion" required by ESA was inadequate, consequently all lease related activities which might endanger species in violation of § 7(a)(2) of ESA must be enjoined; and, third, the Secretary's non–compliance with these statutory provisions of ESA implicated a "federal trust responsibility" to the Inupiat Eskimoes and also warranted relief against the Secretary.[32] The court clarified its earlier Memorandum Opinion in an Order dated 1 February 1980.[33] In this Order the district court tolled the operation of 43 C.F.R. § 3316.5(e), which limited to sixty days the deadline for the Secretary's acceptance of "high" bids submitted at the lease sale held on 11 December 1979. By tolling the stipulated time–limit the lease sale was preserved to the extent that the bids could be held in abeyance indefinitely, pending acceptance by the Secretary if the injunction were eventually lifted.

The Order of 1 February also extended the scope of the relief to cover the disputed Dinkum Sands tracts. By agreement of the federal government and the State of Alaska, these tracts are under state management until such time as the ownership of these lands is settled. The court ordered that these arguably federal tracts must be subjected to the same NEPA and ESA requirements as all other portions of the lease sale area within federal control. The court ordered that the "Interim Agreement" which allocated the various disputed tracts to either state or federal control was voidable or subject to renegotiation by the Secretary if "Federal Defendants ascertain that the Interim Agreement fails to provide the Secretary with appropriate powers to comply [as to Dinkum Sands] with NEPA and the ESA."[34]

32. *Id.* at 363.

33. *Reprinted in* J.A. at 86–87.

34. *Reprinted in* J.A. at 87.

Contrary to the view expressed by the district court, we hold that the Secretary of Interior complied in substance with all requirements and procedures attendant upon an OCSLA leasing project. The environmental protections required by NEPA and ESA as well as other statutes have been met as of this stage of the project. In light of this country's extreme need for fuel resources, plus the long delay factors involved and massive preparations entailed by the search for oil, on 8 July 1980 this court vacated the injunction issued by the district court. In lifting the injunction, the Order of 8 July permitted the Secretary *to accept bids* on the Beaufort Sea tracts and *execute leases* with the "high" bidders, which he has done. The lessees then became entitled to undertake limited "preliminary activities" as contemplated within OCSLA for the lease stage of an outer continental shelf oil and gas project. For the sake of the expedition vitally necessary in the development of national oil resources, consistent with the will of Congress and mindful of the environment, the court's 8 July Order thus anticipated this opinion.

## III. ANALYSIS

### A. *NEPA (National Environmental Policy Act)*

The strictures of NEPA are procedural in character. They ensure solicitude for the environment through formal controls and thereby help realize the substantive goal of environmental protection. The Supreme Court has warned of the impropriety of federal courts introducing additional procedural or substantive standards into the statutory provisos for administrative action. In *Vermont Yankee Nuclear Power Corp. v. NRDC*[35] the Court insisted that even though NEPA established "significant substantive goals for the Nation"

35. 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

the duties it imposed upon agencies were "essentially procedural."[36] NEPA was designed "to insure a fully informed and well–considered decision" by the responsible administrative authority, which could quite conceivably be different from one preferred by reviewing courts.[37] Given a "fully informed" and "well–considered" decision, an agency decision is entitled to judicial deference; in other words, an informed and deliberate agency decisionmaker is entitled to be arguably "wrong," a court's differing view of wisdom in administration notwithstanding. Obedience to NEPA is a matter of the administrative agency acquiring and digesting useful information about the environmental ramifications of major federal projects.

The district court recognized explicitly its limited competence to overturn the Secretary of the Interior on NEPA grounds,[38] citing *Vermont Yankee* and *Strycker's Bay Neighborhood Council v. Karlen.*[39] The court's formal tribute to these Supreme Court cases, however, was somewhat impugned by the punctilio of scrutiny to which the Secretary's EIS was subjected. The EIS is both a tool and a test to make sure that *an agency* takes a good "hard look" at the pertinent environmental questions.[40] We agree with the district court's understanding that given "reasonable consideration to all significant impacts" is all that can be demanded of an agency.[41]

Emphasis, however, is important, and *Strycker's Bay* provides some considerable insight into the principles of judicial review under NEPA:

> *Vermont Yankee* cuts sharply against the Court of Appeals' conclusion that an agency, in selecting a course of action, must elevate environmental concerns over other appropriate considerations. On the contrary, once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club,* 427 U.S. 390, 410, n.21 [96 S.Ct. 2718, 2730, n.21, 49 L.Ed.2d 576] (1976). See also *FPC v. Transcontinental Gas Pipeline Corp.,* 423 U.S. 326, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976).[42]

The Court continued this analysis in the following footnote to the above passage:

> [T]he appellate court required HUD to elevate environmental concerns over other, admittedly legitimate, considerations. Neither NEPA nor the APA provides any support for such a reordering of priorities by a reviewing court.[43]

The district court cited *Strycker's Bay,* in fact, when it stated: "The statute [NEPA] does not preclude a decision that presents either risk or certainty of serious environmental damage so long as the decision is not arbitrary and capricious."[44] The EIS, then, is not an end in itself, but rather a means toward the goal of better decision-

---

**36.** *Id.* at 558, 98 S.Ct. at 1219.

**37.** *Id.*

**38.** *North Slope Borough,* 486 F.Supp. at 345 nn. 15, 16.

**39.** 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (per curiam).

**40.** *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976); *NRDC v. Morton,* 458 F.2d 827, 838 (D.C.Cir. 1972).

**41.** *North Slope Borough,* 458 F.Supp. at 345–46, citing *Vermont Yankee Nuclear Power*

*Corp. v. NRDC,* 435 U.S. at 553, 98 S.Ct. at 1216.

**42.** 444 U.S. at 227, 100 S.Ct. at 500.

**43.** *Id.* at 228 n.2, 100 S.Ct. at 500 n.2.

**44.** *North Slope Borough,* 486 F.Supp. at 345, citing 444 U.S. at 225, 100 S.Ct. at 499 (discussing applicability of Administrative Procedure Act, 5 U.S.C. § 706(2)(A) to judicial review of EIS's). *See Alaska v. Andrus,* 580 F.2d 465, 472 (D.C.Cir.), *vacated in part as moot,* 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978) (petition to enjoin OCS lease sale denied notwithstanding Secretary of Interior's rejection of advice of EPA, CEQ and others).

making.[45] We agree with the Secretary that the district court occasionally lost sight of the limited technology behind an EIS.[46]

The district court's partial difficulty with the impressive EIS prepared for the Beaufort Sea lease sale is surprising in that the court conceded, correctly, that "[t]he decision of how much detail to include is one for the agency itself," guided by a "rule of reason." [47]

We now take up the specific holdings of the district court as they pertain to the Beaufort Sea EIS.[48]

### 1. Cumulative Impact

■ There are other significant energy development projects besides the Beaufort Sea lease sale in Alaska's North Slope area: [49] three prominent examples are drilling in Prudhoe Bay, the Alaska Natural Gas Pipeline, and the TransAlaska Pipeline.

We agree that it is eminently reasonable that the Secretary of Interior must consider the significance of cumulative impacts and assimilate within his decisionmaking any synergistic threats to the environment.[50] We do not all agree that

> Plaintiffs argue correctly that the Beaufort Sea EIS fails to alert the decision maker to all possible environmental consequences of the proposal before him

because it does not adequately consider cumulative impacts of the proposal and other energy projects on the North Slope .... The EIS ignores many cumulative impacts and gives only cursory treatment to others that it does address.

.   .   .   .   .

An acknowledgement of the existence of cumulative impacts is not sufficient. The EIS must alert the decision maker to the nature of those cumulative effects for the discussion to have utility.[51]

It is simply not a fair evaluation of this EIS to conclude that cumulative impact analysis was given short shrift. *Cumulative impact* was adverted to on no fewer than sixteen pages of the EIS.[52] The EIS steered the decisionmaker toward consideration of prospective cumulation of adverse effects on the environment; the cumulative impact issues was not capriciously ignored. The following excerpt from the EIS exemplifies the attention to this problem:

> 5. Cumulative Impacts: This proposed sale, plus other State and Federal Sale activity tentatively planned in the general region, must be considered in terms of cumulative impacts on affected areas.[53]

.   .   .   .   .

**45.** *See* Reply Brief for Federal Appellants at 7 n.1a; *see* Preamble to CEQ's new NEPA regulations, 43 Fed.Reg. 55978 (29 Nov. 1978).

**46.** *Id.*

**47.** *North Slope Borough*, 486 F.Supp. at 345. See *Alaska v. Andrus*, 580 F.2d 465, 475 (D.C. Cir.), *vacated in part as moot*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978) ("[R]ule of reason necessarily governs both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them.") (emphasis in original); *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir. 1977) ("EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate [under "rule of reason"] if it has been compiled in good faith and sets forth sufficient information ... [to permit] a reasoned decision after balancing ... risks ... against ... benefits. . . .").

**48.** The Final Environmental Impact Statement, cited here simply as EIS, was prepared by the

Department of Interior's Bureau of Land Management and issued in 1979 after receiving prodigious comments and holding extensive public hearings. The document runs to three volumes. There is no issue in this case of procedural irregularities in the compilation of these materials.

**49.** *North Slope Borough*, 486 F.Supp. at 347.

**50.** *See Kleppe v. Sierra Club*, 427 U.S. 390, 409–10, 96 S.Ct. 2718, 2729–2730, 49 L.Ed.2d 576 (1976).

**51.** *North Slope Borough*, 486 F.Supp. at 347–48.

**52.** EIS at 205–07, 215, 226, 230, 236, 259, 264, 267–69, 272–74, 279.

**53.** The discussion and enumeration in the EIS of specific other sale activity in the region has been omitted.

All of these proposed actions, by both Federal and State governments would result in impacts similar to, but cumulatively greater than, the impacts discussed in section III. The most likely effect will be a limiting of the subsistence lifestyle because of less availability of some species some years, and a slightly limited habitat to hunt and fish in. This could drastically impact the Inupiat social and physical well–being; however, the amount of this [sic] potential changes cannot be estimated. See section III. C. 2 for further discussion of these proposed activities.[54]

This discussion, and others like it, satisfies a "rule of reason." The EIS leaves the Secretary in a good position to consider that possible environmental hazards to the Beaufort Sea may exceed those contemplated solely in connection with the one lease sale. There is no valid allegation that the EIS disguises or distorts the potential for cumulative harms; to the contrary, the statement points out clearly the existence of the compound problem. There is certainly sufficient notice there to presume that the decisionmaking process would have–and did–incorporate concern for cumulative impacts. We think it highly significant that there is no argument that there was *existing information* which the EIS failed to identify.[55]

We are also unimpressed by the asserted distinction of qualitative and quantitative discussion of cumulative impacts in this context.[56] The EIS is an integrated document, and must be weighed in its entirety. Qualitative discussion of environmental consequences abounds throughout its pages and are critically relevant to the "cumulative impact" passages. Astute reading of these passages requires reference to associated sections spelling out the nature of environmental impacts which would be well known upon the reader's and decisionmakers' completion of the document. In fact, the excerpt quoted above makes explicit reference to other detailed sections of the EIS. The informational impact of the EIS is itself cumulative.

### 2. Alternatives to the Proposal

We are in accord with the district court's proposition that "NEPA requires that an EIS include consideration of alternatives to a proposed action."[57] We agree with the theory expressed in the district court's reflection upon *Vermont Yankee*: "The agency itself determines what alternatives should be considered and how extensive its treatment of them should be."[58] Our partial disagreement lies only as to how stringently in practice a court will dissect an EIS.

Consequently, we affirm the ruling that alternative energy sources were adequately discussed within the EIS.[59] Twenty pages of discussing a spectrum of other energy sources is plainly sufficient under NEPA.[60] The specificity of EIS treatment of alternatives is a matter of agency discretion.[61]

We believe, however, that the degree of the district court's dissection of the EIS went beyond requiring the agency to take a "hard look" at the questions of alternative lease stipulations and management schemes.[62]

As discussed above in Part I.C.2., the Secretary imposed numerous conditions on prospective lessees of Beaufort Sea tracts. These conditions were designed to mitigate

---

54. EIS at 259.

55. *See Manygoats v. Kleppe*, 558 F.2d 556, 560–61 (10th Cir. 1977).

56. *North Slope Borough*, 486 F.Supp. at 348.

57. *Id.*, citing 42 U.S.C. § 4332(2)(C)(iii) (1976).

58. *North Slope Borough*, 486 F.Supp. at 348 (discussing *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. at 551, 98 S.Ct. at 1215).

59. *North Slope Borough*, 486 F.Supp. at 348–49.

60. *See* EIS at 366–86.

61. *NRDC v. NRC*, 606 F.2d 1261, 1272 (D.C.Cir. 1979).

62. *See North Slope Borough*, 486 F.Supp. at 349.

directly certain conceivable intrusions upon the environment.[63] The district court opinion recognizes [64] that the EIS sets out satisfactory mitigating factors which the Secretary considered and incorporated within his operating orders to the lessees.[65] But the court found fault, mistakenly in our view, with the EIS's proposal for lease stipulations that would regiment the operations of the lessees.[66] The decisionmaker, the court reasoned, would be ill-informed in violation of NEPA without a full-blown explication of alternative lease stipulations.[67]

We are compelled to reverse this ruling on two grounds. First, the very concept of "alternatives analysis" is problematic as applied to an evaluation of lease stipulations. It is difficult to imagine how the EIS [68] could be much more helpful than "merely set[ting] forth the content of each stipulation and its general rationale." [69] The lease restrictions were, after all, adopted by the Secretary as suggested within the EIS. They constitute *restrictive* instructions to the lessees which can only inhibit the scope of the lessees' operations. As the stipulations are in no way *permissive*, it is unduly speculative how else the Secretary might have thought to discipline the lessees. The restrictions, applied to the lessees through the stipulations prepared for their leases, are just one means relied upon by the Secretary to give force to environmental considerations defined and described in EIS discussions. This much surely is within the discretion of the Secretary.

To emphasize again: the stipulations restrict the lessees by decision of the Secretary, who has provided the rationales behind the choice of these stipulations in the EIS.[70] Moreover, some of the stipulations are so categorical as to admit of no alternatives,[71] at least not of any alternative which would be *more* favorable to environmental interests. The highly restrictive nature of the lease stipulations tends to obviate the consideration of other stipulations. The stipulations, of course, are not simple *elements* of the decisionmaking process, but rather, they are complex *products* of decisionmaking analogous to interlocutory decisions by the Secretary and are informed themselves by surrounding analysis and discussion within the EIS. The Secretary retains full authority under the OCSLA to require the lessees to conform to his guidelines for the sake of environmental protection.[72] The existence of stipulations *ex ante*, then, is simply a method the Secretary has chosen to anticipate certain problems, but does not foreclose further restrictions should their need arise.[73]

Second, another ground of disagreement with the district court is quite simply that it appears that the Secretary did in fact have alternative lease stipulations before him. When the EIS is examined in light of—and along with—the Secretarial Issue Document (SID),[74] the presentation of alternative lease possibilities is manifest. An example may be found with regard to *Federal Stipu-*

63. *See* notes 18–28 & accompanying text *supra.*

64. *North Slope Borough*, 486 F.Supp. at 349.

65. *See* Part I.C.3 *supra.*

66. *See North Slope Borough*, 486 F.Supp. at 349.

67. *Id.*

68. *See* EIS at 288–352.

69. *North Slope Borough*, 486 F.Supp. at 349.

70. EIS at 288–352.

71. *See* note 23 & accompanying text *supra.*

72. *See* 43 U.S.C. § 1334(a), as amended; *see* note 16 *supra.*

73. It would be interesting to speculate whether the Secretary would have escaped criticism for the alleged failure to provide alternative lease stipulations if he had failed to incorporate each and every stipulation proposed by the EIS within the draft leases themselves. This "failure" of the draft leases to correspond one hundred percent to the EIS proposed stipulations might have cast the "leftover" stipulations as "alternatives."

74. Issued 16 Oct. 1979, by BLM of DOI and Division of Minerals and Energy Resources, Alaska Dep't of Natural Resources, *reprinted in* J.A. at 339.

*lation No.* 8[75] which established a seasonal drilling restriction for the first two years of lease operations, limiting drilling to the *winter* months when whales were less likely to be in the lease area.[76] The SID indicates. that the Secretary was apprised of possible variations on the seasonal limitation as well as no limitation whatsoever.[77] The SID poses and discusses explicit alternatives for restrictions upon lease operations. Possibilities enumerated and analyzed include: delay, modification, and cancellation of the lease sale.

Clearly, then, if the SID, as part of the administrative record, is an acceptable object of judicial review under NEPA standards, then the Secretary has satisfied absolutely the requirement of discussing alternative lease stipulations and other mitigating measures. The district court looked only to the EIS proper. We believe this narrow focus unnecessarily prejudiced the district court's opinion of the Secretary's decisionmaking process.

The SID was a compilation of studies and analyses in part by the Department's Bureau of Land Management, and reflected deliberative materials which informed the Secretary's decisions. The SID, as a decisional document, would have supported a favorable district court evaluation of the EIS as complemented by interpretations available through perusal of the former document. The level of discretion afforded to the Secretary by the "rule of reason" requires no less than that the district court probe deeply before deciding that required

analysis is fatally defective or absent altogether.

This is not a case where an EIS makes no mention of an environmental issue (*i. e.,* lease stipulations and mitigating measures) and then it is suggested that some peripheral document covers new ground, thereby *curing the original defect.* Rather, the situation here is one in which the EIS undertakes substantial discussion of lease stipulations and mitigating measures along with their rationales as environmental prophylactics. The SID simply shows that these protective measures were not fortuitous. It shows, on the contrary, the measures were reasoned *and chosen* from among alternatives. In other words, these particular passages of the SID merely elucidate (at a secondary level of examination) and eliminate legitimate doubts concerning the extensiveness of the (primary) discussion of mitigating measures and lease stipulations in the EIS.

Since transparency of the administrative process is a critical goal judicial review is meant to further, reason suggests that a court, under these circumstances, would profit from some additional insight into the meaning and scope of the EIS provided by a related document. Where an EIS raises an issue, but a court suspects the answer may be insufficiently comprehensive, other contemporaneous deliberative materials which speak to the same issue could fairly allay that suspicion. Failure so to clarify the EIS, where the facility to do so is obvious within the administrative record,[78] is not

---

**75.** *See* note 23 *supra.*

**76.** *See id.* and accompanying text.

**77.** SID at 30–37, 64–75, *reprinted in* J.A. at 405–14, 442–53.

**78.** The proposition that an EIS may reasonably be supplemented is supported in the following passage from the Second Circuit's decision in *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1384 (2d Cir. 1977):

Although review of deliberative memoranda reflecting an agency's mental process (such as the PDOD [program decision option document]) is usually frowned upon, *see United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, [1004] 85 L.Ed. 1429 (1941); *Montrose*

*Chemical Corp. v. Train,* 160 U.S.App.D.C. 270, 491 F.2d 63, 68 (1974), in the absence of formal administrative findings they may be considered by the court to determine the reasons for the decision–maker's choice. *See* [*Citizens to Preserve*] *Overton Park* [*v. Volpe*], 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 [other citations omitted].

That plaintiffs, such as North Slope Borough, claim they were unaware of the 16 October 1979 SID until 26 November 1979, *see* Brief for Appellees North Slope Borough, *et al.,* at 28, does not destroy the document's usefulness to the court. As discussed in the accompanying text, the SID is helpful as a complement to the EIS, interpreting some issues raised there. The

consistent with the judicial standard holding an agency only to "reasonable consideration [of] all significant impacts." [79]

### 3. Marine Sanctuary as Alternative Management Scheme

"Under the Marine Sanctuaries Act, 16 U.S.C. §§ 1431–34, the Secretary of Commerce can designate portions of the Outer Continental Shelf as marine sanctuaries, which would give the Secretary authority to issue and enforce 'necessary and reasonable regulations to control any activities permitted within the designated marine sanctuary . . . .' 16 U.S.C. § 1432(f)." [80] Relying on the First Circuit's decision in *Commonwealth of Massachusetts v. Andrus*,[81] the district court held, in one highly abbreviated paragraph, that the Secretary's EIS was defective in its failure to discuss "other Federal statutory schemes, such as the Marine Sanctuary [sic] Act." [82]

We note that the facts in the First Circuit case were critically different, and that the holding there was explicitly tentative.[83] That case is a weak precedent here. We reverse the district court and now hold that the Secretary's consideration of the marine sanctuary alternative was adequate under the instant circumstances.[84]

Two factors should clear the air on this topic quickly: (1) the EIS was not totally silent on the marine sanctuary alternative, and (2) the National Oceanic and Atmospheric Administration (NOAA), the responsible division of the Department of Commerce, had never designated the Beaufort Sea as an "active candidate" for marine sanctuary status. These facts distinguish completely the case at bar from the First Circuit's tentative holding the other way.[85]

First, the EIS speaks directly to the marine sanctuary alternative in that portion of the document considering possible delays of the lease sale pending further development

---

documents taken together render the Secretary's decision–making process transparent: a court may better evaluate precisely what alternatives and analysis were entailed by certain relatively sparse passages in the EIS. *See Conservation Law Foundation v. Andrus*, 623 F.2d 712 (1st Cir. 1979) (court looks at multiplicity of documents prepared by agency which add to rather than replace earlier ones). There are no elements of information withholding, or *post hoc* rationalization contained in this use of the SID. The timing of the document's release was unrelated to the prior benefit its contents contributed to the Secretary's decisionmaking outlined in the EIS.

**79.** *See* note 41 *supra*.

**80.** *Commonwealth v. Andrus*, 594 F.2d 872, 884–85 (1st Cir. 1979).

**81.** *Id.*

**82.** *North Slope Borough*, 486 F.Supp. at 349.

**83.** We therefore leave it open, for future ruling by the district court, whether the [1978 OCS-LA] amendments provide any reason to modify what is *our tentative decision*, that the environmental impact statement should be extended to include a discussion of the marine sanctuary alternative. *The court should also consider the issue in light of the Supreme Court's Vermont Yankee opinion.*
*Commonwealth v. Andrus*, 594 F.2d at 886 (emphasis added).

**84.** It must always be recalled to mind that the framing of alternatives in the EIS is committed to the discretion of the responsible agency. *NRDC v. NRC*, 606 F.2d 1261, 1271–72 (D.C. Cir.1979).

**85.** *Cf. Commonwealth v. Andrus*, 594 F.2d at 884–86.

In subsequent decisions concerning the same litigation, the First Circuit understandably retrenched from its earlier, tentative ruling with respect to the marine sanctuary question and affirmed judgments denying preliminary injunctions. *See Conservation Law Foundation v. Andrus*, 617 F.2d 296, 299 (1st Cir. 1979) and *Conservation Law Foundation v. Andrus*, 623 F.2d 712 (1st Cir. 1979). In this latter case, the court wrote:

Appellants now claim that the discussion of the marine sanctuary alternative in the FSES [Final Supplemental Environmental Statement] is inadequate. Whether or not the entire issue of the sanctuaries alternative has been mooted by NOAA's decision [to withdraw the Georges Bank from active consideration as a nominee for sanctuary designation] we need not decide. The lengthy discussion of the alternatives in the FSES, together with the consultation with NOAA certainly demonstrate that the objective of identifying and seriously considering reasonable alternatives has been achieved.
*Id.* at 1052 (footnote omitted). We reach the same conclusion for parallel reasons.

of certain studies and decisions. The EIS was in no way oblivious to the marine sanctuary alternative, as one may discern instantly from a sample paragraph excerpted from its discussion:

> If the proposed Beaufort Sea area is designated as a Marine Sanctuary with delegation of management authority to Department of Commerce, oil and gas operations in the area could be severely reduced from that which would occur under a national management strategy of balancing conflicting uses of the area.[86]

Even noting the obvious point that "[m]anagement under the Marine Sanctuaries Act (MSA) could result in different administrative decisions concerning OCS oil and gas development than management under the OCS Lands Act, as amended (OSCLA [sic])"[87] indicates beyond a doubt that the Secretary was alerted to a marine sanctuary management scheme for the Beaufort Sea as an alternative to the contemplated lease sale.

A second basis for affirming the Secretary's treatment of the marine sanctuary possibility arises out of the relevant factual background. The Beaufort Sea was never an active candidate for designation as a marine sanctuary by the Department of Commerce.[88] The subagency in charge of marine affairs, NOAA, wrote in a letter dated November 1979, "[T]he Beaufort sea and other frontier OCS areas off Alaska are not being considered for sanctuary status that would block oil and gas activity."[89]

In light of NOAA's reservations on the marine sanctuary question and the EIS's serious discussion of this alternative, we find that the Secretary satisfied any NEPA requirements regarding alternative management schemes.[90] It is worth noting that the EIS itself offers that the "Marine Sanctuary restrictions [would] not be more strict" given the "mitigating measures in place and proposed for this lease [which] are stringent" as the "OCSLA requires compliance with all other laws such as the Marine Mammal [Protection] Act and Endangered Species Act. . . ."[91]

### 4. Uncertainty

We affirm the district court's holding that "[t]he worst case analysis contained in the EIS was a reasonable means of alerting the decision maker to the dangers presented by proceeding in the face of uncertainty."[92] The Secretary plainly cannot be expected or required to wait until the totality of environmental effects is known.[93]

The lease sale phase of the OCS project here under review presents a record of facts and doubts that have not yet fully matured. The awful prospect of a major oil spill–the worst case[94]–is far removed from categorical relevance at this stage. Drilling for commercial quantities of oil is in all likelihood at least two years away, even under a

---

86. EIS at 395; see generally id. at 393–96.

87. Id.

88. Cf. note 84 supra.

89. Reprinted in J.A. at 508.

90. Aside from the Marine Sanctuaries Act, no "other Federal statutory schemes," were suggested either by the district court or plaintiffs–appellees, North Slope Borough, 486 F.Supp. at 349.

91. EIS at 395.

92. North Slope Borough, 486 F.Supp. at 347 (discussing speculative worst case analysis in EIS at 277).

93. See State of Alaska v. Andrus, 580 F.2d 465, 473 (D.C.Cir.), vacated in part as moot, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978).

> One of the costs that must be weighed by decisionmakers is the cost of uncertainty–i. e., the costs of proceeding without more and better information. Where the cost has been considered, and where the responsible decisionmaker has decided that it is outweighed by the benefits of proceeding with the project without further delay, the courts may not substitute their judgment for that of the decisionmaker and insist that the project be delayed while more information is sought. Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, [2730 n.21], 49 L.Ed.2d 576 (1976).

Id. at 473–74 (footnotes omitted) (emphasis in original).

94. North Slope Borough, 486 F.Supp. at 347.

turn of events most favorable to the government and the oil companies.[95] Uncertainty over remote hazards can be rectified as more information is collected: *where* the oil is discovered and *how much* of it there is are crucial factors that will instruct the Secretary in his developing view of costs and benefits. It is more logical and efficient to ask certain questions when the truth of their premises is unveiled. It may eventuate that exploratory drilling is disappointing, or that severe environmental hazards become more clearly perceived. This perspective comports with the multistage approach mandated by Congress for this kind of oil and gas development. The 1978 amendments to the OCSLA sanction the administrative practice of dividing OCS projects into leasing, exploration, and production stages.[96] In fact, a second EIS is required by the OCSLA covering the development and production stage of an OCS project.[97]

At this stage of review, then, we are chiefly (though not exclusively)[98] concerned about those hazards associated with the limited preliminary activities permitted to the lessees during the lease sale phase of the Beaufort Sea project.[99]

The numerous and continuing constraints on the oil companies ensure that any future development in the Beaufort Sea will be highly studied and conscientious. The cost of current uncertainty over environmental hazards is abated by these constraints; they temper the finality of the Secretary's early decisions (such as the decision to conduct a lease sale, and accept "high" bids). The Secretary retains full power under the OCSLA to modify or disapprove any of the lessees' plans that "would probably cause serious harm or damage to life . . ., to property, . . . or to the marine, coastal, or human environment."[100] Congress provided the judiciary with jurisdictional competence corresponding to this ongoing power of the Secretary to modify or disapprove any future plans likely to harm the environment. The court of appeals for the circuit embracing the presumptively affected area has jurisdiction directly to review all actions concerning approval, modification, or disapproval of exploration plans.[101] Thus, in the case of the Beaufort Sea, the Ninth Circuit is vested with extensive jurisdiction to review the environmental issues arising as the project matures. The same pattern of comprehensive Secretarial approval and judicial review holds for the production and development stage of an OCS project.[102] Most significantly, however, Congress has directed the Secretary to promulgate regulations providing for the suspension or cancellation of leases when necessary to protect the environment.[103]

The Beaufort Sea lease sale is part of an OCS project which will necessarily occasion reevaluations before the anticipated–but by no means assured–production of oil on a commercial scale. The analysis heretofore accomplished by the Secretary in the EIS well covers imminent and prospective environmental difficulties with the project. At this stage, with prodigious proposing and reviewing to follow, we have no doubt that this EIS, useful and reasonably foresighted as it is, is valid under NEPA.

**95.** *See* note 27 & accompanying text *supra.*

**96.** *See* notes 16 & 17 *supra.*

**97.** 43 U.S.C. § 1351(f) as amended; *see* note 16 *supra.*

**98.** *See County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1378–81 (2d Cir. 1977) (discussing information required at early stage of multistage project).

**99.** *See* 44 Fed.Reg. 53686 (14 Sept. 1979), *codified at* 30 C.F.R. 250.34–1. *See also* notes 7, 8 & accompanying text *supra.*

**100.** 43 U.S.C. § 1334(a)(2)(A)(i), as amended, *see* note 16 *supra; see generally Id.* §§ 1334(a)(1)–(2), 1334(b), & 1340(c)(1).

**101.** *Id.* § 1349(c)(2).

**102.** *Id.* §§ 1351(a), 1351(c), & 1349(c)(2).

**103.** *Id.* §§ 1334(a)(1)–(2); *see also* 44 Fed.Reg. 61896 (26 Oct. 1979), *codified at* 30 C.F.R. 250.-12(a)(1)(iv) and 44 Fed.Reg. 61897 (26 Oct. 1979), *codified at* 30 C.F.R. 250.12(d)(4).

## B. *ESA (Endangered Species Act)*

Bowhead whales habitually swim through the Beaufort Sea in the course of their annual migrations.[104] Thus, as the Bowhead is an endangered species,[105] the provisions of ESA are applicable to the Beaufort Sea lease sale. We hold that the Secretary has complied in essence with ESA.[106]

Whereas NEPA required extensive *inquiry* into environmental hazards, ESA mandates *affirmative preservation* of endangered life.[107] The famous "snail darter" case, *TVA v. Hill*,[108] made abundantly clear that ESA is a potent environmental control. There, the Supreme Court affirmed an injunction against the operation of a nearly completed major dam. This defused the undisputed threat to the "critical habitat" of the snail darter posed by the impoundment of water behind the Tellico Dam.[109] "[B]egin[ning] with the premise that operation of the Tellico Dam will either eradicate the known population of snail darters or destroy their critical habitat,"[110] the Court stopped the all–but–finished dam project dead in the water.

The categorical force of ESA is plain enough from *TVA v. Hill*. But the case before us is not that case. In contrast to the snail darter with its singular attachment to a "critical habitat" in the Little Tennessee River threatened with complete annihilation, the Bowhead's relationship to the Beaufort Sea was never declared by the Secretary of Interior to be so precarious.[111]

Though the affected species were conceded to be broadly "endangered" in both cases, the issue of specific "jeopardy" separates them. The proposed "agency action" in the Beaufort Sea has not been found likely to jeopardize an endangered species in violation of section 7(a)(2) of ESA,[112] whereas behind the Tellico Dam the "jeopardy" point had been generally conceded.[113]

The principal substantive import of ESA is in the section 7(a)(2) requirement that the Secretary ensure that all "agency action" is not likely to jeopardize the continued existence of an endangered species. Section 7(b) of the ESA[114] sets out a process of "consultation" whereby the agency with jurisdiction over the endangered species issues to the Secretary a "biological opinion" assaying the nature and extent of the jeopardy posed to that species by the "agency action" and discussing therein the implications for section 7(a)(2). In section 7(d), the statute also forbids "irreversible or irretrievable" commitment of resources foreclosing reasonable and prudent alternatives in respect of "agency action" that might violate section 7(a)(2).[115] The district court held that ESA had been violated, and we now reverse. As the parties press complex appeals and cross–appeals it is necessary to discuss the ESA claims in some detail.

### 1. *"Agency Action"*

The lease sale itself is just one step in the development of the oil–rich outer continental shelf. A question arises, there-

---

104. *See* Part I *supra.*

105. 35 Fed.Reg. 18370 (12 Dec. 1970).

106. Amendments to the statute enacted 19 December 1979 were intended to clarify, not alter, the law. *See* Pub.L. No. 96–159; 93 Stat. 1225, 1228 (1979); H. Conference Rep.No. 697, 96th Cong., 1st Sess. *reprinted in* [1979], U.S.Code & Ad.News 2557.

107. *See TVA v. Hill*, 437 U.S. 153, 188 n.34, 98 S.Ct. 2279, 2298, 57 L.Ed.2d 117 (1978).

108. *Id.*

109. *Id.* at 171, 98 S.Ct. at 2290.

110. *Id.*

111. *Cf.* 40 Fed.Reg. 47506 (9 Oct. 1975); 41 Fed.Reg. 13926–28 (1 April 1976), *codified at* 50 C.F.R. 17.81. Pursuant to authority granted in ESA, the Secretary issued those regulations to declare that "[t]he proposed impoundment of water behind the proposed Tellico Dam would result in total destruction of the snail darter's habitat." 40 Fed.Reg. 47506 (9 Oct. 1975). Obviously the Secretary of Interior takes a different position in the instant litigation.

112. 16 U.S.C. § 1536(a)(2) (Supp. II 1978).

113. *See* note 111 *supra.*

114. 16 U.S.C. § 1536(b) (Supp. II 1978).

115. *Id.* § 1536(d).

fore, whether the dictates of ESA apply to "agency action" which is an oil exploitation project viewed (a) as a continuum of planned events, or (b) as discrete segments of a multistage OCSLA venture.[116] The perceived magnitude and certainty of potential hazards to endangered life would naturally differ depending on the scope of "agency action" to which ESA "consultation" will refer. In other words, the legal adequacy of any "biological opinion" submitting that a proposed "agency action" does not jeopardize endangered life (and hence does not violate section 7(a)(2)) must first be tested by matching the meaning of "agency action" in that opinion with a legal definition of that same term.[117]

The district court rejected the defendant's contention that the multistage flexibility contemplated within the OCSLA framework was an indication that ESA "endangered life" considerations should be entertained stage–by–stage.[118] We find ourselves in qualified agreement with the district court's ruling that a "biological opinion" may not deal exclusively with any one particular stage of an outer continental shelf project. We agree that

> [c]aution can only be exercised if the agency takes a look at all the possible ramifications of the agency action. As Senator Culver stated,

> > The earlier in the progress of a project a conflict [between a species and the project] is recognized, the easier it is to design an alternative consistent with the requirements of the act, or to abandon the proposed action.[119]

This statement is much too sensible to quibble with. The relevant statutes–ESA, NEPA, OCSLA–all insist on foresight.

Evaluating an outer continental shelf project in the light of all contemplated and congruous actions merely reflects that "pumping oil" and not "leasing tracts" is the aim of congressional policy.

It might be more difficult to reach this conclusion if we believed either that ESA and OCSLA were irreconcilable, or, that the standards implicit in the latter were materially weaker than those of the former. Fortunately, it can be demonstrated that the two statutes are melded within the unfolding events of an outer continental shelf lease sale.

This showing has quite convincingly been made in *Conservation Law Foundation v. Andrus*:[120]

> [T]he standards of these two acts are complementary, and the ESA will continue to apply of its own force to major actions taken by the Secretary after the lease sale is held. Thus, the Secretary claims, if he cannot, for example, insure that exploration will not jeopardize the continued existence of the right and humpback whales, he will not approve exploration plans, yet need not compensate the lessees. . . . The ESA by its terms applies to all action by the Secretary. Therefore, any contract which he enters into (e. g., a lease) which requires future action on his part (e. g., approval of plans) will contain as an implied term a condition that the Secretary will behave lawfully (e. g., not violate the ESA). . . . [T]he strictures of the ESA apply to lease applicants as well as the government. Thus, under the ESA both the Secretary and the lease applicants have certain obligations which can be fulfilled without

---

116. *See North Slope Borough*, 486 F.Supp. at 358, 363.

117. ESA defines "agency action" only as "any action authorized, funded, or carried out by such agency." 16 U.S.C. § 1536(a) (Supp. II 1978).

118. *North Slope Borough*, 486 F.Supp. at 350–51 ("agency action constitutes the lease sale and all resulting activities").

119. *Id.* at 351, quoting from Cong.Rec. at S10,-896 (17 June 1978) (Remarks of Senator Culver).

120. 14 [BNA] E.R.C. 1049, 1050–51 & nn. 2–3 (1st Cir. 17 Dec. 1979).

abrogating any explicit terms of the leases.[121]

When this analysis is combined with our own earlier discussion of "uncertainty" as a problem an EIS must reckon with,[122] it becomes clear that the Secretary of Interior retains strict control of an outer continental shelf project for its duration, from lease sale to depleted, run–dry well. And, as information and experience is collected, the Secretary is in better shape to respond sensitively to environmental needs and wisely to oil–strikes.

So, then, the segmented approach of OCSLA does not attenuate ESA's notion of "agency action." It does, however, qualify somewhat the broadest practical effect the term could have. Mandatory stage–by–stage review prevents the telescoping of any and every projected hazard to endangered life and to the environment into one overwhelming statutory obstacle. The OCSLA standards are not less strict, they simply rely more on achieving compliance than on exacting proscription. By ensuring graduated compliance with environmental and endangered life standards, OCSLA makes ESA requirements more likely to be satisfied both in an ultimate and a proximate sense.

In short, "agency action" in this case may signify the lease sale and all subsequent activities, but satisfaction of the ESA mandate that no endangered life be jeopardized must be measured in view of the full contingent of OCSLA checks and balances and all mitigating measures adopted in pursuance thereof.[123] In light of the above discussion, we further hold that the Secretary "did perform[ ] a comprehensive analysis of all the ramifications of the lease sale." [124]

### 2. Section 7(b) "Biological Opinion"

■ The existence of a "biological opinion" and its conclusions are the pivots around which ESA analysis must turn.[125] As the district court noted, "[t]he sole issue under § 7(b) is whether the November 6, 1979, letter from Mr. Terry Leitzell of NMFS [126] to Mr. Frank Gregg, Director of the Bureau of Land Management (BLM) constitutes a biological opinion." [127] The district court concluded that this letter was not a "biological opinion," so section 7(b) was not satisfied.[128]

We must disagree. There is ample evidence that the Secretary was meaningfully alerted to the biological considerations attaching to Bowhead whales in the Beaufort Sea. The Secretary could reasonably conclude that the lease sale did not endanger the whales. For these reasons, the substantive prescription of section 7(a)(2) to preserve endangered life has been honored.

121. *Id.*

122. *See* Part III.A.4. *supra.*

123. *See* notes 9–28 & accompanying text *supra.*

124. *Cf. North Slope Borough*, 486 F.Supp. at 351.

125. The federal parties have not explicitly appealed the district court's decision (*see* notes 127–28 & accompanying text *infra* ) that there was no valid § 7(b) "biological opinion." Opening Brief for Federal Appellants at 26. Their decision "not to appeal the ESA question was based on practicalities, taking into account the district court's observation that the lack of an adequate biological opinion 'can probably be cured by the government fairly easily.' " *Id.*, quoting *North Slope Borough*, 486 F.Supp. at 356–57 n.91. The government is, apparently, preparing a new biological opinion, *see* Appellees' Brief for the Federal Parties at 20 n.10, 26 n.14. The intervenors do appeal the lower court ruling on the "biological opinion." *See* Reply Brief for Appellants Atlantic Richfield Company at 11–14.

126. National Marine Fisheries Service is an agency responsible for marine mammals including the Bowhead. 50 C.F.R. 222.23(s).

The Department of Interior's BLM initiated consultation (pursuant to § 7(a)(2) of ESA) with NMFS concerning possible jeopardy of the Bowhead in the Beaufort Sea on 30 March 1978. J.A. at 457.

127. *North Slope Borough*, 486 F.Supp. at 352. The court also stated: "The letter indicates that insufficient information exists to determine whether the lease sale and resulting activities violate § 7(a)(2)." *Id.* The letter itself is reprinted in J.A. at 486–87.

128. *North Slope Borough*, 486 F.Supp. at 352.

We reach this result quite simply. The letter of 6 November was considered to be a section 7(b) "biological opinion" by the authoring agency.[129] That letter states:

> On November 2, 1979, your staff [at the Department of the Interior's BLM] orally requested that *NMFS prepare a final biological opinion pursuant to Section 7(b)* of the ESA as amended.
>
> .    .    .    .    .
>
> Therefore, NMFS believes that the Department of the Interior cannot insure that its actions will not jeopardize bowhead and gray whales *unless the alternatives suggested below are adopted.*[130]

The letter, written four days after the oral request, was not a careless or hasty aside. It incorporates by reference two biological documents transmitted earlier to the Department of the Interior.[131]

Since the administrative parties have indicated that the letter of 6 November was requested by BLM as, and intended by NMFS as, a "biological opinion," and since these contentions are not unreasonable, we accept the letter (and associated documents)[132] as such.[133] Furthermore, as the letter of 6 November vouched for the safety of the whales conditionally,[134] satisfaction of ESA's section 7(a)(2) requiring the Secretary to ensure that his "actions will not jeopardize bowhead and gray whales," would depend on whether "the alternatives suggested below [in the 6 November letter] are adopted.[135]

We hold that section 7(a)(2) was not violated as the Secretary incorporated in the "final notice of sale"[136] the suggested alternatives that NMFS indicated could ensure the freedom from jeopardy for the endangered whales. These saving alternatives, of course, constituted the bulk of the lease stipulations[137] and the mitigating measures subsumed under "Information to Lessees."[138]

### 3. Section 7(d) "Irreversible or Irretrievable" Commitments

■ These same arguments compel us to affirm the district court's ruling that sec-

---

**129.** The opinion's author, the Director of NMFS, stated in an affidavit that the letter was intended to be a "biological opinion." Affidavit of Terry Leitzell, *reprinted in* J.A. at 517.

**130.** *Reprinted in* J.A. at 486 (emphasis added).

**131.** *See id.* The letter referred to documents prepared pursuant to § 7(b) and released on 25 August 1978 and 15 October 1979, respectively. The documents taken together, we believe, constitute a sufficient summary of the "information on which the opinion is based" along with evaluations and alternatives to satisfy ESA, 16 U.S.C. § 1536(b) (Supp. II 1978).

It is quite clear that a favorable "biological opinion" may be issued even though the "absence of complete data on a species [makes] it impossible to know with complete certainty the potential impact of an agency action on a listed species." 125 Cong.Rec. H9,650 (24 Oct. 1979) (remarks of the sponsor, Mr. Breaux, of the 1979 Amendments to ESA, 16 U.S.C. § 1536(b), as amended by Pub.L.No. 96–159 (19 Dec. 1979)). *See also* H.Conference Rep. No. 697, 96th Cong., 1st Sess. 12 [1979], *reprinted in* U.S.Code Cong. & Ad.News 2557 (agency has continuing obligation to develop information when biological opinion rendered on basis of incomplete information).

**132.** *See* note 78 *supra.*

**133.** *See Braniff Airways, Inc. v. CAB*, 379 F.2d 453, 462 (D.C.Cir.1967) ("recital by an administrative agency that it has considered the evidence and rendered a decision according to its responsibilities" must be respected and not "overcome by speculative allegations").

**134.** *See* note 130 & accompanying text *supra.*

**135.** *Id.*

**136.** 44 Fed.Reg. 64752 *et seq.*, (7 Nov. 1979) *reprinted in* J.A. at 488–506. The proximity in time of the letter and the final notice is easily explained. The suggested alternatives (with supporting analyses) had been officially proposed by NOAA as late as 15 October 1979 in a letter transmitted to the Department of Interior (AR/DOI, Ex. VII–2–(1)). This was the second document incorporated by reference alluded to in the 6 November letter. *See* note 129 *supra.* This is further testimony to the 6 November letter's being a culmination of earlier biological studies which qualified the letter as an adequate "biological opinion." The considerable extent of biological consultation is manifest. *See* EIS at 392 & Appendix 6.

**137.** *See* Part I.C.2. *supra.*

**138.** *See* Part I.C.3. *supra.*

tion 7(d) was not violated [139] in that ESA permits the non–jeopardizing activities planned here.[140] Plainly, the preliminary activities permitted by this lease sale [141] entail no "irreversible or irretrievable commitment of resources with respect to the Agency action which has the effect of foreclosing ... alternative measures which avoid jeopardizing the continued existence of any endangered or threatened species ...." [142] We agree with the district court that the oil companies are prepared for the risk of losing these resources which are at stake in the lease sale. Furthermore, "[t]he government has accepted some of these risks with the enactment of the Outer Continental Shelf Lands Act. This Court cannot undermine Congressional willingness to accept some of the risks of oil and gas production, merely because the subsequent production might violate § 7(a)(2)." [143]

## C. Federal Trust Responsibility

■ The plaintiffs alleged below that the federal government has a trust responsibility to the Inupiat Eskimoes, Alaskan natives who live throughout the North Slope Borough. The district court agreed that a trust responsibility existed, but construed that responsibility as coextensive with the requirements of the various environmental statutes implicated in the case. Having found the Secretary to be in violation of ESA, the court held that "to the extent the Secretary has not complied with the Endangered Species Act, he has also shirked his trust responsibility to the Inupiats." [144]

We, however, have concluded that the substance of ESA requirements has been satisfied by the Secretary.[145] Nevertheless, we agree with the district court that "[a] trust responsibility can only arise from a statute, treaty, or executive order"; [146] in this respect we are governed by the recent Supreme Court decision in *United States v. Mitchell* [147] holding that the United States bore no fiduciary responsibility to Native Americans under a statute which contained no specific provision in the terms of the statute.[148]

---

**139.** *See North Slope Borough*, 486 F.Supp. at 357.

**140.** *See also Conservation Law Foundation v. Andrus*, 623 F.2d 712 (1st Cir. 1979) (ESA in force throughout duration of lease sales); notes 10–11, 120–21 & accompanying text *supra* (Secretary has ongoing authority to disapprove plans to enforce OCSLA and ESA).

**141.** *See* notes 4–8 & accompanying text *supra*.

**142.** 16 U.S.C. § 1536(d) (Supp. II 1978).

**143.** *North Slope Borough*, 486 F.Supp. at 357. Given the conceded "incomplete information" on which the biological opinion is based, and the government's declared intention to prepare a new opinion, *see* note 125 *supra*, we reach no conclusion as to whether the § 1536(a) "consultation" process is still ongoing. *But cf. North Slope Borough*, 486 F.Supp. at 354–55. Section 7(d) is only triggered while "consultation" continues. *See Conservation Law Foundation v. Andrus*, 623 F.2d 712 (1st Cir. 1979). *Conservation Law Foundation v. Andrus*, also considering the § 7(d) question, in an almost identical OCS lease sale context, determined that no ESA violation had been demonstrated. To be sure, the procedural posture of that case was different. There, the court considered an appeal from a denial of a preliminary injunction below, but nevertheless, the court's reasoning and holding are persuasive here.

**144.** *North Slope Borough*, 486 F.Supp. at 344.

**145.** *See* Part III.B.2. *supra.*

**146.** *North Slope Borough*, 486 F.Supp. at 344.

**147.** 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (U.S.1980).

**148.** The Court construed strictly the statute whence the allegation that the government was a fiduciary. Liability to the Indians for money damages stemming from alleged mismanagement of land allotted to them under the General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C. §§ 331–48, was the question before the Court. The Court also noted that there were six other modern statutes "relevant to the Secretary's responsibilities with respect to Indian timber resources." 100 S.Ct. at 1351 n.1. The majority of the Court held that the General Allotment Act of 1887 did not unequivocally afford a sufficient manifestation of Congress' intent to create a trust. *See id. Mitchell*, however, left open the questions of whether, on remand, other statutes might support the assertion of a trust responsibility, or whether a "special relationship" between the United States and Indian tribes could support that claim. *See id.* at 1356 n.7. We also do not reach these questions.

We have no specific provision for a federal trust responsibility in any of the statutes argued to us. We do recognize the related statutory situation, as did the district court, that:

[e]very statute and treaty designed to protect animals or birds [e. g., Marine Mammal Protection Act, 16 U.S.C. § 1371(b); ESA, 16 U.S.C. § 1539(e)] has a specific exemption for Native Alaskans who hunt the species for subsistence purposes. These statutes have been construed [e. g., People of Togiak v. U.S., 470 F.Supp. 423, 428 (D.D.C.1979)] as specifically imposing on the Federal government a trust responsibility to protect the Alaskan Natives' rights of subsistence hunting.[149]

By confining the extension of "trust responsibility," however defined and whatever the source, to the area of overlap with the environmental statutes, the district court was arguably consistent with the Supreme Court's rationale in United States v. Mitchell.[150] Without an unambiguous provision by Congress that clearly outlines a federal trust responsibility, courts must appreciate that whatever fiduciary obligation otherwise exists, it is a limited one only.[151]

We realize that the vitality of the Inupiat society and culture depends on the dynamic relations that the Inupiats maintain with their environment. Their subsistence lifestyle requires the hunting and fishing of the region's whales, caribou, seals, polar bears, fish and birds. There can be no denying that the advent of oil rigs and operators, or even geologists, will not be an especially welcome intrusion. Still we are confident that the Secretary has fulfilled his trust obligation, such as it is.

First, the primary threat to the Inupiats can only be viewed as one of a possibly deleterious intrusion into their lands. But the Secretary, even aside from his imputed role of trustee, does not have a free hand to neglect the environment. All of the environmental statutes, particularly ESA, structure and prescribe for the Secretary a solicitous stance toward the environment. Hence, where the Secretary has acted responsibly in respect of the environment, he has implemented responsibly, and protected, the parallel concerns of the Native Alaskans. In sum, the substantive interests of the Natives and of their native environment are congruent. The protection given by the Secretary to one, as we have held, merges with the protection he owes to the other.

A second ground which directly vindicates the Secretary's responsibility to the Inupiats is also available. Simply, it is that the Secretary did in fact give purposeful attention to the special needs of the Inupiats. Under the heading of "Protection of Subsistence Harvest Activities,"[152] and in other places,[153] there is obvious consideration given by the Secretary (and the environmental impact process) to the fears of the Inupiat people. The Secretary did, moreover, follow the advice and recommendations of an Assistant Secretary which were aimed at easing any adverse impacts on the Inupiats.[154]

Of course, no one can claim that the interests of the Eskimoes, or of the environ-

149. *North Slope Borough*, 486 F.Supp. at 344.

150. *See* note 148 *supra.*

151. *Cf. United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. at 1354–56. It is worth noting that the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 *et seq.* (1976), arguably precludes the existence of a general federal trust responsibility to the Eskimoes. *See Cape Fox Corp. v. U.S.*, 456 F.Supp. 784, 799 (D.Alaska 1978).

152. EIS at 337.

153. For example, pp. 254–59 of the EIS discuss "Subsistence Food Gathering Impacts" as do pp. 122–25. *See also* SID at 43–44, *reprinted in* J.A. at 421–22.

154. *See* Memorandum of Assistant Secretary for Policy, Budget and Administration, Department of the Interior, to the Secretary, *reprinted in* J.A. at 475–78 ("I believe the presale planning process has worked effectively and that environmental safeguards are in place to permit the leasing of this high potential area with due regard for important environmental and [Inupiat] cultural values.") *Reprinted in* J.A. at 475.

ment for that matter, were an overriding veto staying the Secretary's hand with respect to other public concerns. Discretion, though, is given to the Secretary to make responsible decisions which balance the public and social interests involved.[155] We feel that the balances effected by the Secretary are proper ones given his statutory role. Yet, each "balance" invokes tension and compromise of dual values [156] that are disappointing in some degree. The tension implicit in the Secretary's required actions—whether by statute or otherwise—cannot be transformed into a veto for any one particular set of interests which would halt the Secretary's delegated decisionmaking. The possibility of that frustrating outcome is sown in the irony that has the same group of plaintiffs urging the preservation of endangered whales so that Eskimoes may subsist on those same endangered whales.

## IV. OCSLA (OUTER CONTINENTAL SHELF LAND ACT)

■ The plaintiffs made a further claim to halt the lease sale under the OCSLA itself.[157] Basically, they contend that the Secretary and his subagencies have not done enough studies to comply with OCS-LA. We affirm the district court's holding on exactly the rationale it adduced.[158] More research is necessary; the research is being done.[159]

The plaintiffs also claim the required use of the "best available and safest technology" (BAST) has been neglected in violation of section 21 of OCSLA.[160] We affirm the district court's conclusion that BAST is evolutionary rather than fixed at any one particular time, and continues to apply to both the lessees and the Secretary.[161]

The final difficulty with which we must contend regards the claim appealed by plaintiffs that section 7 of OCSLA [162] which provides for interim agreements between a state and the federal government, does not permit the Secretary to devolve upon Alaska responsibility for the management of the disputed Dinkum Sands tracts.[163]

The relevant statutory section provides, in part:

Nothing contained in this section shall be construed to alter, limit, or modify any claim of any State to any jurisdiction over, or any right, title, or interest in, any submerged lands.[164]

---

**155.** Cf. *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980).

**156.** See generally Parts III.A. & B. *supra.*

**157.** *North Slope Borough,* 486 F.Supp. at 358–59 (discussing § 20(a) of OCSLA, 43 U.S.C. § 1346(a)).

**158.** *North Slope Borough,* 486 F.Supp. at 359.

**159.** We also affirm the district court's holding and rationales regarding the other statutory and treaty claims pressed by plaintiffs, and rejected below. See *North Slope Borough,* 486 F.Supp. at 360–62. These claims refer to ESA, §§ 9(a)(1), 3(13), 3(19), 16 U.S.C. §§ 1538, 1532(13), 1532(19); Marine Mammal Protection Act, 16 U.S.C. §§ 1361, 1372(a)(2)(A); Migratory Bird Treaty of 1916, 39 Stat. 1702 (16 Aug. 1916); Migratory Bird Treaty with Japan, Treaty of 4 March 1972, 25 U.S.T. 3329, etc. (*see, e. g.,* Brief for Cross–Appellants North Slope Borough at 23–24). The district court wrote, and we agree:

The application of these statutes and treaties to the instant case to some extent paral-lels the mandates of the Endangered Species Act (see Section III). The statutes and treaties do not require the government to halt all activity merely because there is a possibility that agency action will result in a "taking" at some future time. Rather, the government must proceed with caution to ensure that agency action does not eventually violate the aforesaid laws.

*North Slope Borough,* 486 F.Supp. at 362.

**160.** 43 U.S.C. § 1347(b), as amended, *see* note 16 *supra.*

**161.** *North Slope Borough,* 486 F.Supp. at 360. See *Conservation Law Foundation v. Andrus,* 623 F.2d 712 (1st Cir. 1979); *see also* notes 10-11, 120–21, 139 & accompanying text *supra.*

**162.** 43 U.S.C. § 1336, as amended, *see* note 16 *supra.*

**163.** *See* note 34 & accompanying text *supra.*

**164.** 43 U.S.C. § 1337(h), as amended, *see* note 16 *supra.*

Initially, the district judge rejected the claim,[165] but in his Order dated 1 February 1980 [166] he extended the relief granted to cover Dinkum Sands.[167] We note that the parties, the State of Alaska, and the United States submitted the question of who owns the disputed tracts for resolution by the Supreme Court.[168]

Our resolution of this issue is necessarily ambivalent. We have held that the Secretary has complied with his statutory duties, we note that Alaska was not a party below and appears specially before us only as *amicus curiae*,[169] and that the ripeness of the issue is questionable given the lawsuit pending before the Supreme Court.

At this juncture, however, we are not required to issue what would, in effect, be on the order of an advisory opinion regarding the law applicable in the disputed, state–managed tracts.[170] For the time being, the coordination in planning and execution of the federal/state lease sales would appear to make it likely that the environmental standards realized in lease operations undertaken in Dinkum Sands will match those on the federal tracts. Naturally, it will be a Supreme Court ruling that decides this issue ultimately.[171] As we have lifted the injunction pertaining to federal tracts, we also feel it appropriate to free the state–managed tracts from that injunction against preliminary activities.

## V. CONCLUSION

Our Order of 8 July 1980 vacated the relief issued below in favor of plaintiffs. This opinion supports that Order and allows the Beaufort Sea lease sale (including Dinkum Sands) to proceed, along with any con-

comitant preliminary activities permitted under OCSLA and the relevant regulations. This is only a first step for the developers of oil potential in the Beaufort Sea; perhaps, we acknowledge on the precedent of similar cases, likewise for the litigants.

*Affirmed in part and reversed in part.*

---

165. See *North Slope Borough*, 486 F.Supp. at 359–60.

166. See note 34 & accompanying text *supra*.

167. His reasons are stated in Memorandum Opinion (1 Feb. 1980) at 2–3, *reprinted in* J.A. at 78–79.

168. *United States v. Alaska*, No. 84 (original jurisdiction) (pending).

169. See generally Brief of State of Alaska Appearing Specially as *Amicus Curiae* (asserting,

*inter alia*, principles of sovereignty and Eleventh Amendment Sovereign Immunity).

170. This conclusion might have differed had we held that the Secretary was in violation, and that the injunction against the federal lease sale must continue in force. The Alaska Supreme Court, we are informed, has permitted the state lease sale to proceed.

171. Assuming no settlement is reached voluntarily between the State and the federal government.