Jay HAMMOND, Governor of the State of Alaska, Robert E. LeResche, Commissioner of the Department of Natural Resources, and Frances A. Ulmer, Director, Division of Policy Development & Planning, Appellants,

v.

NORTH SLOPE BOROUGH, Eben Hopson, Sr., Jacob Adams, City of Barrow, Village of Nuiqsut, Village of Point Hope, Village of Kaktovik, Village of Wainwright, Archie K. Brower, Village of Anaktuvuk Pass and Native Village of Point Lay, Appellees.

AMOCO PRODUCTION CO., Atlantic Richfield Co., Conoco, Inc., Exxon Corp., Gulf Oil Corp., Mobil Oil Corp., Phillips Petroleum Co., Shell Oil Co., Sohio Alaska Petroleum Co., Tenneco Oil Co., and Union Oil Co., Appellants,

v.

NORTH SLOPE BOROUGH, Eben Hopson, Sr., Jacob Adams, City of Barrow, Village of Nuiqsut, Village of Point Hope, Village of Kaktovik, Village of Wainwright, Archie Brower, Village of Anaktuvuk Pass and Native Village of Point Lay, Appellees.

VILLAGE OF KAKTOVIK, Village of Wainwright, Archie K. Brower, Village of Anaktuvuk Pass and Native Village of Point Lay, Cross-Appellants,

v.

Jay HAMMOND, Governor of the State of Alaska, Robert E. LeResche, Commissioner of the Department of Natural Resources, Frances A. Ulmer, Director, Division of Policy Development & Planning, Amoco Production Co., Atlantic Richfield Co., Conoco, Inc., Exxon Corp., Gulf Oil Corp., Mobil Oil Corp., Phillips Petroleum Co., Shell Oil Co., Sohio Alaska Petroleum Co., Tenneco Oil Co., and Union Oil Co., Cross-Appellees.

NORTH SLOPE BOROUGH, Eben Hopson, Sr., Jacob Adams, City of Barrow,

Village of Nuiqsut and Village of Point Hope, Cross-Appellants,

v.

Jay HAMMOND, Governor of the State of Alaska, Robert E. LeResche, Commissioner of the Department of Natural Resources, Frances A. Ulmer, Director, Division of Policy Development & Planning, Amoco Production Co., Atlantic Richfield Co., Conoco, Inc., Exxon Corp., Gulf Oil Corp., Mobil Oil Corp., Phillips Petroleum Co., Shell Oil Co., Sohio Alaska Petroleum Co., Tenneco Oil Co., and Union Oil Co., Cross-Appellees.

Nos. 5550, 5558, 5560 and 5561.

Supreme Court of Alaska.

May 7, 1982.

Bruce J. Terris & Philip G. Sunderland, Washington, D. C., Conrad Bagne, Barrow, and Charles Cranston, Cranston, Walters & Dahl, Anchorage, for North Slope Borough, et al.

Craig J. Tillery, Alaska Legal Services Corp., Anchorage, Michael I. Jeffrey, Alaska Legal Services Corp., Barrow, for Kaktovik, et al.; Donald E. Clocksin, Anchorage, of counsel.

Wilson L. Condon, Atty. Gen., Juneau, and Michael E. Arruda, Asst. Atty. Gen., Anchorage, for Jay Hammond, et al.

Richard O. Gantz & Carl J. D. Bauman, Hughes, Thorsness, Gantz, Powell & Brundin and Theodore E. Fleisher and Paul R. DeStefano, Ely, Guess & Rudd, Anchorage, for Amoco Production Co., et al.

James W. Moorman, Asst. Atty. Gen., Washington, D. C., Rene J. Gonzalez, U. S. Atty., Anchorage, Margaret Strand, Washington, D. C., and Cynthia L. Pickering, Anchorage, for the U. S. as amicus curiae.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

BURKE, Justice.

This appeal concerns a decision by the State of Alaska to lease offshore tracts in the Beaufort Sea for oil and gas exploration and development. That decision culminated in a lease sale held on December 11, 1979. The matter is before this court as a result of a suit filed by persons claiming that the lease sale will adversely affect the ecology and wildlife resources of the area and the centuries-old traditions and lifestyle of the Inupiat Eskimo people.

## FACTS

The sale had its origin in November 1974, when the State of Alaska issued a lease

schedule which included three prospective Beaufort Sea lease sales. The sales were set for March 1976, September 1977 and July 1978. These sales were postponed, however, due to a dispute with the federal government over the ownership of certain tracts in the sale area. Efforts to resolve this dispute eventually led to the announcement of a joint federal-state lease sale, scheduled for December 1979.

On March 31, 1978, Governor Hammond announced a five year oil and gas leasing schedule. The schedule analyzed onshore and offshore leasing areas for oil and gas potential, environmental sensitivities and other factors, in an attempt to develop rationally the state's oil and gas resources. In January 1979, a final five year leasing plan was submitted to the legislature for its consideration. This proposal included the December 1979, Beaufort Sea lease sale.

Public comments were solicited on the March 31, 1978, proposal. Legislative hearings were conducted on the final five year plan by the Eleventh Alaska Legislature, and the Beaufort Sea sale was the subject of hearings held by the House Interim Committee on Leasing, the Senate Resources Committee, and the House Resources Committee.

The lands involved in the Beaufort Sea lease sale were determined in March of 1978, after a joint call by the state and federal governments. Public comments were submitted and, as a result of environmental considerations, substantial deletions to the total proposed area were made.

In May 1978, the Joint Federal/State Beaufort Sea Task Force (Task Force) was organized to assist the Commissioner and Secretary of Interior in developing a management plan for the sale. The Task Force was to assist in identification of problems associated with the lease documents, permits, regulations, guidelines, environmental impact statements, mitigating measures, presale procedures, operating requirements, exchange of data, postsale surveillance, unitization and drainage, and the interim agreement. The plan submitted by the Task Force was approved by the Secretary of Interior and the Governor in January 1979. In April 1979, a Joint Federal/State Draft Environmental Impact Statement (DEIS) was released. Hearings on the DEIS were held in May and June of 1979 in Fairbanks, Kaktovik, Nuiqsut, and Barrow. In addition to the oral testimony at the public hearings, numerous written comments were received. After a review of the comments concerning the DEIS, a Final Environmental Impact Statement (FEIS) was completed and released in August 1979.

In addition, a Joint Federal/State Issue Document (JF/SID) was prepared, which outlined for the Secretary of the Department of Interior and Commissioner LeResche the important issues regarding the sale and possible alternative methods for development of the area.

The Commissioner also had the benefit of the Beaufort Sea Outer Continental Shelf Assessment Program (OCSEAP), which began in 1976. The program was an interdisciplinary effort by government and private sector scientists to assess the effects of oil and gas exploration and development in the Beaufort Sea. The studies conducted by OCSEAP scientists provide the basis for many of the restrictions ultimately placed on the sale and on the lessees.

In August 1979, the federal government published a proposed notice of sale for its portion of the lease sale. The state published its required notices between October and December 1979. The notices contained information concerning the proposed lease sale, its location, the acreage involved, and the availability of specific lease terms. Also during that time period, a letter of invitation was sent by the Department of Natural Resources to the North Slope Borough, the villages of Kaktovik, Nuiqsut, Wainwright, and the City of Barrow inviting consultation with the Department of Natural Resources and soliciting comments on the proposed lease sale. No response was received from any of the named villages or the North Slope Borough.

On October 25, 1979, the Commissioner prepared written findings and a formal decision, as required by AS 38.05.035(a)(14).

He concluded that it was in the best interest of the state to proceed with the joint federal/state oil and gas lease sale on submerged state, federal, and disputed land in the Beaufort Sea.

The Commissioner's findings and decision addressed the purpose of the lease sale, whether the Department adequately prepared for the sale to allow a responsible best interest decision, and whether the sale in all its particulars was consistent with the public interest. It analyzed the Beaufort Sea lease sale in terms of: (1) its social, cultural, environmental and economic impact on the state; (2) the social and industrial needs of the state, now and in the future; (3) the consistency with the Alaska Coastal Management Program (ACMP), as well as the proposed North Slope Borough Coastal Management Program; (4) environmental concerns and protections; (5) imposition of numerous stipulations and conditions to minimize any negative impact upon arctic wildlife, including whales, caribou, polar bear, seals, migratory birds, fish and other marine organisms; (6) the impact on the Inupiat Eskimos; and (7) the selection of bidding systems. Reference was made to the numerous documents and sources considered by the Commissioner.

On October 26, 1979, the Governor, the Commissioner, and the Secretary of Interior met, to discuss the final sale terms. As a result of agreements reached, on October 29, 1979, the joint federal/state notice of lease sale for the Beaufort Sea was signed.

The Beaufort Sea and nearby shore areas are habitat for many wildlife species. Included are the bowhead and grey whales, polar bear, seals, fish, caribou and great numbers of birds. At the present time, little is known about the breeding habits, mating activities, critical habitat and the effect of human activity on the whales. The bowhead has been listed as endangered since December 1970, under both the Federal Endangered Species Act and its predecessor, the Endangered Species Conservation Act of 1969. Commercial whaling of the bowhead has been prohibited since 1946 by the International Convention for the Regulation of Whaling. Present estimates of the bowhead population range between 1,783 and 2,865 animals.

The FEIS recognizes the importance of subsistence activities to the Inupiat culture, and the substantial impact on the Inupiat society which would result from significant reductions in their subsistence resources. It points out that the Inupiat people rely heavily on many of these species for subsistence, particularly the bowhead whale. The significance of subsistence activities is not limited to food gathering, but involves social and cultural identification of a traditional and unique lifestyle. Whaling, for example, serves to integrate the community socially and culturally, in addition to providing the Inupiat with an important food source.

Present studies of the bowhead show that they inhabit the Bering Sea in winter, migrating northward in the spring, through the Beaufort Sea and into the Canadian arctic. The return migration occurs in the fall, when the whales migrate westward along the north coast of Alaska and then southward into the Bering Sea. It is assumed, in the FEIS, that the whales travel through portions of the lease area during their fall migration. Available data indicates that during their spring migration, the whales remain outside the lease area, and that they are well to the west of the area prior to April.

The Beaufort Sea is the nearshore portion of the Arctic Ocean beginning at Point Barrow and running east into Canada beyond the delta of the Mackenzie River. North from the shoreline, the sea bed slopes gradually to the edge of the Continental Shelf, approximately eighty kilometers from shore. In the area of the lease sale, a string of low sand islands, the Barrier Islands, parallels the shoreline, approximately five to twenty kilometers offshore. Inside the Barrier Islands water depth ranges from five to thirty feet.

During the winter, different types of ice exist in the Beaufort Sea. Nearshore, the water freezes to the bottom; further from shore, at greater water depths, the water

does not freeze to the bottom but does remain shorefast. Beyond the shorefast ice there is a "transition zone" and pack ice. Pack ice moves with the currents throughout the year, exerting tremendous force on anything in its path.

Shorefast ice extends out to the 13 meter isobath. The zone of transition extends from the 13 to the 20 meter isobath, and at approximately the 20 meter isobath pack ice is encountered. Under the terms of the leases any structures seaward of the 13 meter isobath are required to undergo a test period before drilling is allowed.

Because of the foregoing factors, a number of stringent lease restrictions and stipulations were imposed to mitigate otherwise predicted environmental effects. Important lease stipulations are:

No. 1: Discovery of historic or archaelogic sites or objects requires immediate report to the state and effort at preservation.

No. 2: Lessee must include in plans submitted to the state for approval a proposed environmental training program for all personnel involved in exploration or development.

No. 3: After exploration, all structures must be removed from the site, and the site restored to its original condition, unless the site will be used for development.

No. 4: Surface entry is prohibited on Cross Island and Pole Island from May 15 to August 15 to protect nesting birds during mating season.

No. 5: State can require lessee to conduct environmental surveys of biological populations or habitats needing additional protection, and can then require action to modify operations or prevent adverse impact on such area.

No. 6: Discharge of produced waters is prohibited except that the state may allow discharges on a case-by-case basis in tracts in a depth of more than 10 meters. Discharge of drilling muds and cuttings is also prohibited, unless case-by-case permission is given.

No. 7: Pipelines are required if environmentally preferable, and must be placed in designated areas.

No. 8: Solid waste disposal is prohibited either on natural or artificial islands or in marine waters.

No. 9: Drilling is restricted to November 1 to March 31 outside the barrier islands, and to November 1, to May 15 inside the islands if safe operation is demonstrated. The restriction remains in effect for two years following issuance of the lease.

No. 10: Entry on the biologically sensitive Boulder patch is prohibited, and operations must be performed from outside this area.

No. 13: Seismic activity is prohibited from March 20 until breakup, except that case-by-case activity may be allowed by the state.

No. 14: Lessees are subject to all valid coastal zone plans and ordinances.

In addition, the lessees were informed that no drilling could occur beyond the Barrier Islands in water depths in excess of 13 meters until a test structure had survived two winter seasons. The state also requires the lessees to submit a plan of operations for both the exploratory and development phases of lease operations. Included in the plan of operations must be an inventory of archaeological and historical sites in the lease area and an analysis of the effects of activity on the sites. The lessees must also supply other details concerning the extent of the resource needs of their activities and must furnish a spill prevention, control, and countermeasure plan for each drill site.

Surface use will be restricted, as necessary, to prevent unreasonable conflicts with local subsistence harvests. A buffer zone of 1500 feet between fresh water sources and sewage ponds or oil storage facilities will be required unless this is not physically feasible or prudent, as determined by the state. Lessees may not extract "borrow" from barrier islands and extraction from lagoons or nearshore areas is prohibited, unless it would not have an adverse environmental effect or no alternative source exists.

Free movement and safe passage must be allowed to fish and mammals, both onshore and offshore. Continuous fill causeways are prohibited, but noncontinuous fill causeways may be allowed with state permission. To protect birds and caribou, aircraft and helicopter operations are restricted during certain time periods. No diminishment in the use and enjoyment of a native allotment is allowed. Bidders are also advised that leases are subject to the Marine Mammal Protection Act and international treaties.

These protections were developed in response to those studies showing that the Beaufort Sea and nearby shore areas are habitat for many wildlife species. In addition to the need to preserve such species, and other lower life forms, as a matter of environmental conservation, it was recognized, as already noted, that the human population of the North Slope relies on many of the species for subsistence and as an integral part of their cultural identity. The FEIS noted:

> The essence of the contemporary Barrow Inupiat culture is evidenced in the whaling. This is also true, but to a much lower degree, of the Nuiqsut and Kaktovik Inupiat who depend more on the caribou. Whaling, governed by patterns of cooperation and an elaborate structure of sharing and distributing, serves to integrate the community socially and culturally ... [¶] The significance of subsistence is not in food gathering alone, but with the intertwining of food gathering and the sociocultural identification of a traditional and unique lifestyle. This Inupiat lifestyle gives the Natives of the region a sense of pride, identity, distinction, and unity. [¶] The whaling culture complex of Barrow and the previously mentioned cultural complexes of Nuiqsut and Kaktovik are of great symbolic value. If whaling were to permanently cease among the Inupiat of Barrow because of outside intervention, the results would be catastrophic. The same is true of the

cultural complexes of Nuiqsut and Kaktovik. Socioculturally, the damage would be irreparable.

In light of the importance whaling has to their culture, it is not surprising that the Inupiat people regard any threat to whaling with the utmost seriousness. They are already engaged in a running battle with the International Whaling Commission over the number of whales they are permitted to harvest each year, and scientific estimates place the whale population at its lowest historic levels. Both bowhead and grey whales are classified as endangered species by federal authorities. Extensive studies are still underway to determine essential information about their behavior. Until more is known, the National Marine Fisheries Service has declined to certify that the whales will not be jeopardized by the project, but did offer the Secretary and the Commissioner "reasonable and prudent alternatives" to cancelling the sale. The main alternative was inclusion of a seasonal restriction.

## PROCEEDINGS BELOW

On November 29, 1979, the North Slope Borough and several of its officials filed suit in the superior court, seeking to enjoin the leasing of tracts outside the Barrier Islands. The villages of Kaktovik and Wainwright joined the suit a few days later, arguing that the entire lease sale should be cancelled.[1]

Superior Court Judge Jay Hodges heard argument on December 7, 1979, and denied the plaintiffs' request for a preliminary injunction. Accordingly, after nearly five years of planning, the lease sale was held on December 11, 1979. With the sale an accomplished fact, the plaintiffs sought to have it set aside and to prevent oil and gas operations by the companies that had purchased leases.

On June 12, 1980, after hearing argument on the parties' cross motions for summary judgment, Judge Hodges rendered his decision. He ruled in favor of the state and the

---

1. Other villages later joined in the action.

oil companies on a number of issues, holding that the lease sale did not violate the federal Endangered Species Act, the Marine Mammal Protection Act, or the Migratory Bird Treaty Act. Similarly, he found no violation of Alaska's Endangered Species Act or its Coastal Management Act. Although he concluded that the Alaska Public Meetings Act had been violated, Judge Hodges ruled that the violation was harmless, and that, in any event, the Act should only be applied prospectively. He further held that the state acted properly in selecting the method of bidding used at the sale.

Judge Hodges ruled, however, that the Commissioner, in deciding to hold the sale, had failed to determine adequately the effect that oil and gas operations "would have on the Inupiat subsistence lifestyle from a cultural, economic and social standpoint." Therefore, he ordered the Commissioner to reconsider this aspect of his decision, and to submit additional findings in support thereof. Until his order was complied with, Judge Hodges forbade "physical entry onto any of the lease tracts" and "exploration or related activities on the leases." [2]

The Commissioner submitted additional findings and conclusions to the superior court on July 11, 1980. Judge Hodges reconsidered his decision in light of these findings and announced his final decision on September 10. With respect to oil and gas activities in the lease sale area outside the Barrier Islands, he concluded that the record failed to demonstrate a reasonable basis for the Commissioner's finding that these activities would have only slight or minimal impact on subsistence resources and the subsistence lifestyle of the Inupiat Eskimo people. Therefore, he ruled invalid the Commissioner's overall finding that the disposal of state lands beyond the Barrier Islands was in the state's best interests, and, with minor exceptions, enjoined the state and the oil companies from entering that portion of the lease sale area. As to those tracts inside the Barrier Islands, he concluded that there was a reasonable basis for the Commissioner's findings regarding impact on the Inupiat's subsistence lifestyle and affirmed the Commissioner's overall best interests determination.

On September 17, 1980, Judge Hodges stayed his own order, so that exploration outside the Barrier Islands could continue, pending an appeal of his decision to this court. He concluded that the state and oil companies would suffer irreparable harm if not permitted to go ahead with their operation while the appeal was pending, and that the laws and regulations governing offshore oil and gas activities provided adequate interim protection to the interests of the plaintiffs.

This appeal followed.

## THE PRESENT APPEAL

On appeal, the North Slope Borough, the City of Barrow, the villages of Nuiqsut and Point Hope, and certain individual plaintiffs (hereinafter referred to collectively as the Borough), seek to uphold the trial court's decision to enjoin activity outside the Barrier Islands and urge this court to invalidate the leases in that area. The villages of Kaktovik, Wainwright, Anaktuvuk Pass, Point Lay, and one individual plaintiff (hereinafter referred to collectively as Kaktovik or plaintiff intervenors), argue that all of the leases should be invalidated, whether inside or outside the Barrier Islands. Kaktovik continues to challenge all of the court's other rulings not in its favor, while the Borough limits its attack on those rulings to the questions of the Commissioner's choice of bidding methods and his determination that the project was consistent with the Coastal Management Program.

The state seeks a ruling that the trial court's remand to the Commissioner for additional findings was improper and urges us to uphold the Commissioner's determination in full, as do the oil companies. The state also challenges the court's ruling that the Alaska Public Meetings Act was violated,

---

**2.** The oil companies applied to this court for a stay of Judge Hodges' order forbidding entry onto the leased tracts and exploration activities. On July 1, 1980, we granted a stay, allowing such activities to go forward while the litigation continued.

although no relief was given on that basis, and the court's ruling that the United States is not an indispensible party.[3]

## I. The Commissioner's Best Interest Determination

Alaska's Constitution expresses a policy of encouraging development of the state's natural resources "by making them available for maximum use consistent with the public interest." Alaska Const. art. VIII, § 1. Sections 8 and 9 of article VIII give the legislature the power to lease and sell state lands. Leases must be "subject to reasonable concurrent uses." Alaska Const. art. VIII, § 8.

Much of this power has been delegated to the Division of Lands, within the Department of Natural Resources, by the Alaska Lands Act, AS 38.05.005–.370. AS 38.05.-035(a)(14) gives the Director of the Division of Lands, acting with the consent of the Commissioner of the Department of Natural Resources, the power to sell, lease or otherwise dispose of state lands "when he makes a written finding that the interests of the state will be best served [by such action]."

In this instance, the Commissioner took it upon himself to make the ultimate decision. Acting pursuant to the foregoing authority, Commissioner Robert E. LeResche determined that it was in the best interest of the state to lease submerged lands in the Beaufort Sea for oil and gas exploration and development.

### A. Did the superior court err in first remanding the case to the Commissioner for additional findings?

■ The state's first argument on appeal is that the superior court erred in its determination to remand the case to the Commissioner for additional findings concerning the effect of leasing on the subsistence culture of the Inupiat Eskimo people. The state suggests we reach this issue because it

"will be a recurring concern wherever future land disposals are [p]roposed in areas of subsistence usage." State's Reply Brief at 2, n.1.[4]

We believe that the superior court was correct in its belief that the effect of the sale on the culture and lifestyle of the inhabitants of the area was an important consideration in determining whether the sale was in the state's best interests. Thus, we hold that the superior court did not abuse its discretion in requiring additional findings on that issue. Under the circumstances, it was only prudent for the court to seek additional justification from the Commissioner, in a salutary effort to give the executive branch of government proper deference.

### B. Standard of Review

■ "[I]n cases concerning administrative expertise as to either complex subject matter or fundamental policy formulations," an administrative agency's decision will be reviewed by the court only to the extent necessary to ascertain whether the decision has a "reasonable basis." Kelly v. Zamarello, 486 P.2d 906, 917 (Alaska 1971); see, e.g., Alaska Public Utilities Commission v. Chugach Electrical Association, 580 P.2d 687 (Alaska 1978) (utility commission's decision to award service area to utility company); Mobil Oil Corp. v. Local Boundary Commission, 518 P.2d 92 (Alaska 1974) (boundary commission's decision to authorize incorporation of North Slope Borough); Swindel v. Kelly, 499 P.2d 291 (Alaska 1972) (review of lease cancellation by Department of Natural Resources); Pan American Petroleum Corp. v. Shell Oil Co., 455 P.2d 12 (Alaska 1969) (decision of Department of Natural Resources to issue royalty certification providing for reduced royalty payments to the state). In the instant case, the Commissioner's best interests determination is almost entirely a policy decision, involving complex issues that are beyond this

---

**3.** Appearing as amicus curiae, the United States joins the state in arguing that it is an indispensible party.

**4.** The state does not indicate what relief it seeks based on this claim of error, other than guidance in future cases.

court's ability to decide. As stated in *Moore v. State*, 553 P.2d 8 (Alaska 1976):

[T]his court has neither the authority nor competence to decide whether the public interest is "best served" by a proposed disposition of land [for offshore oil and gas exploration and development]. Nonetheless, a limited review of the Director's [here the Commissioner's] decision [is] available simply to ensure that it was not arbitrary, capricious, or prompted by corruption.

*Id.* at 36 n.20.

Those opposed to the sale argue that the Commissioner's best interests determination was invalid because of the lack of information about the effect that oil and gas development would have upon the subsistence resources and activities of the area and the consequent impact upon the subsistence lifestyle and culture of the Inupiat Eskimo people. The Commissioner concluded that such impact would be minimal, despite the lack of complete information available at the time of his decision. It is contended that this finding involved a question of fact that should have been reviewed according to the substantial evidence test, *see Keiner v. City of Anchorage*, 378 P.2d 406 (Alaska 1963), and that, absent such evidence, the Commissioner's overall best interests determination was arbitrary and capricious and, therefore, without a reasonable basis.

C. *Adequacy of Information to Allow a Finding that the Sale is in the State's Best Interest.*

■ The question of whether an administrative decision may be made in the face of some uncertainty as to its consequences has been presented to the federal courts in other environmental cases, including a parallel case challenging the federal portion of the Beaufort Sea lease sale. In that case the court stated: "The Secretary [of the De-partment of Interior] plainly cannot be expected or required to wait until the totality of environmental effects is known." *North Slope Borough v. Andrus*, 642 F.2d 589, 605 (D.C.Cir.1980) (footnote omitted). *See also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576, 590 n.21 (1976) (court cannot substitute its judgment as to environmental consequences, but should only ensure that the agency has taken a "hard look"). The administrator is thus required to consider the cost of proceeding in the face of uncertainty and can then decide that it is outweighed by the benefits of proceeding without delay. *State of Alaska v. Andrus*, 580 F.2d 465, 473 (D.C.Cir.), *vacated and remanded sub nom. Western Oil & Gas Association v. Alaska*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978).

The Commissioner, of course, must have some information as to the project's effects in order to decide whether it is or is not in the state's best interests. Thus, if the Commissioner had no information whatsoever on the effect of oil leasing on the subsistence lifestyles, it is questionable whether he could reasonably decide that the proposed sale was in the state's best interests. However, complete certainty is not required.

While those opposing the sale attempt to highlight areas where knowledge of the effects of the sale are lacking, we are not convinced that this is a case where the Commissioner is unable to act in the best interests of the state because of a lack of knowledge. First, as the federal court emphasized, the mere decision to lease does not in itself bring about great risks to the environment. *North Slope Borough v. Andrus*, 642 F.2d at 605–06. Exploration and development will take place over time, and adjustments can be made, if and when new data is acquired that reveals additional hazards.[5] The record discloses a number of

5. It should be noted that the situation under the state statute is not the same as was before the federal court in the parallel case. There, the court specifically noted that the Secretary would have another environmental impact statement to consider before the next stage of development proceeded. *North Slope Borough v. Andrus*, 642 F.2d at 606. Here, once the Commissioner makes a best interests decision, there is no requirement that he do anything further before allowing development to proceed. We are thus forced to rely more on the state's good faith than was the federal court, which had only to deal with "the limited pre-

ongoing studies, the most important of which is perhaps the program of research directed to learning more about the bowhead and grey whales.

In addition, great care has been taken to provide protection in those areas in which knowledge is lacking, in the form of stringent lease restrictions, at least for the period necessary to gather more information. For example, stipulation nine restricts exploratory drilling and testing and other "downhole exploratory activities" to the period between November 1 and March 31 outside the Barrier Islands and allows administrative extension of the season to May 15 inside the islands, "if the lessee demonstrates the ability to operate safely and ice conditions justify." This restriction was agreed to by the federal agency responsible for determining whether the whales are adversely affected by the project and applies for at least the first two years after the leases are issued. It is an important protection because what *is* known about the whales is that they are definitely not present in the lease area during the winter months when drilling is to be allowed. In addition, the March 31 cutoff allows approximately sixty days for conducting any necessary oil cleanup operations following a spill, before breakup causes the oil to spread over a wider area.

Another important restriction is designed to provide information on the capacity of drilling equipment to withstand severe ice pressures by prohibiting any drilling "in water depths in excess of 13 meters ... until such time as a test platform ... has been in existence in the sale area at a depth in excess of 13 meters for a period of two winter seasons." The 13 meter zone (or "isobath" as it is technically known) was chosen on the basis of research indicating that current drilling technology permitted safe operation up to that point, but that "year-round oil and gas operations have, as yet, never been attempted under the severe ice conditions that routinely occur" beyond the 13 meter isobath. Scientists thus proposed a test structure requirement before drilling is allowed in the isobath area.

A third important lease restriction is the requirement that no lease operations take place until a plan has been given written approval by the state. The state informed the lessees at the time of the sale that plan approval would require satisfaction of several conditions, including the preparation of a "Spill Prevention, Control, and Countermeasure (SPCC) Plan." Such plans give assurance that the lessee is prepared to deal with an oil spill if one occurs. While the record contains expressions of doubt as to the adequacy of existing technology for cleanup of massive oil spills, actual enforcement of the SPCC requirement would provide assurance of a lessee's ability to contain rapidly the median oil discharge and to contain the maximum probable oil discharge within a reasonable time. Further, capacity to remove the median oil discharge in not more than 48 hours and the maximum probable oil spill within the shortest feasible period of time is required.

The Commissioner plainly believed that conducting the sale at the planned time was consistent with the need to protect the environment, even though complete information about environmental effects and drilling technology was not available. The Commissioner's finding on this subject was that:

> [D]elaying the sale would work to the severe disadvantage of the environmental and social interests in the sale area which are of concern to the public. If the area is leased now, there is sufficient time during the lease exploration and development phase to work out solutions to environmental and social problems and develop any necessary technology needed to operate responsibly offshore in the Arctic. If the sale is delayed beyond the scheduled date, it will have to be indefinitely postponed because of the complex logistics involved in a joint state/federal sale. Each day of delay will place the state one day closer to the time when Prudhoe Bay runs out. As we come closer to that time and it becomes evident there is insufficient lead time to develop any replace-

liminary activities permitted to the lessees during the lease sale phase." *Id.*

ments, decisionmaking will operate at the mercy of the collective panic quotient of the public. At that point, worrying in any detail about environmental and social impacts may become a luxury we literally cannot afford.

Those opposed to the sale argue that the Commissioner merely considered the costs of delaying the sale, ignoring "the costs of proceeding with the sale in the face of uncertainty regarding its impact on subsistence resources and activities." This argument is not supported by the record. While the Commissioner never made such considerations explicit, the entire decisionmaking process reflects an extraordinary effort to (1) ascertain the environmental and social impacts of the sale, (2) adjust the lease provisions to avoid those impacts, and (3) consider a wide range of views on the propriety of proceeding with the sale in the light of the existing fund of information. His supplemental findings and decision show that he gave extensive consideration to the possible impact on subsistence resources and the people of the region, in light of both ongoing and anticipated oil and gas activities. Since the Commissioner considered the effect of uncertainty in making his best interests decision and included substantial measures to mitigate any adverse effects of the lack of knowledge, we are unable to say that there was not a reasonable basis for his ultimate conclusion that the sale was in the state's best interest, despite the lack of information noted.

## II. The Alaska Coastal Management Act

■ The Alaska Coastal Management Act, AS 46.40.010–.210, provides for the establishment of an Alaska Coastal Management Program (ACMP), which is partly designed to ensure that the development of industrial and commercial enterprises is consistent with the environmental and cultural interests of the state. AS 46.40.020. The Act provides that the ACMP is to consist of standards issued by a Coastal Policy Council and district management programs established by coastal resource districts. AS 46.40.030. The current ACMP establish-

es an Office of Coastal Management which must, among other things, "review state and federal actions for consistency with the Alaska coastal management program, subject to council review." 6 AAC 80.030(a)(3). The regulations also provide that a state agency may authorize uses or activities in the coastal area under its statutory authority only if "the agency *finds* that the use or activity is consistent with the applicable district program and the standards contained in this chapter." 6 AAC 80.010(b) (emphasis added).

The Borough and Kaktovik contend that the consistency determinations of the Commissioner and the Office of Coastal Management are procedurally and substantively invalid. Rejecting both of these claims, the superior court first held that neither the Commissioner nor the Office of Coastal Management need to provide written findings or reasons upon which their consistency determinations rest, so long as they establish a record which reflects the basis for their decisions. The court held that such a record was established, and that it revealed a reasonable basis for their decisions.

The ACMP consists of two elements: the local district programs and the state standards found in 6 AAC 80.040–.120. The state standards are extremely protective of the environment. For example, in areas in which there is a "substantial possibility that geophysical hazards may occur," state agencies must ensure that measures have been taken to minimize property damage and protect against loss of life before development of the area may begin. 6 AAC 80.050. State agencies must also "recognize and *assure* opportunities for subsistence usage of coastal areas and resources." 6 AAC 80.120 (emphasis added). With regard to the habitats in coastal areas, they "must be managed so as to *maintain* or *enhance* the biological, physical, and chemical characteristics of the habitat which contribute to its capacity to support living resources." 6 AAC 80.130(b) (emphasis added). Agencies must also "discourage activities which would decrease the use of barrier islands by coastal species, including polar bears and nesting birds." 6 AAC 80.130(c)(5).

These requirements, however, are not absolute. Conflicting uses and activities may be allowed by the district or appropriate state agency if:

(1) there is a significant public need for the proposed use or activity;

(2) there is no feasible prudent alternative to meet the public need for the proposed use or activity . . . ;

(3) all feasible and prudent steps to *maximize* conformance with the standards . . . will be taken.

6 AAC 80.130(d) (emphasis added).

Thus, there are two alternative methods a state agency may use. Either the agency must find that all the specific environmental protections have been met or, if there will be conflicting uses, the agency must find that the three pronged test delineated above has been satisfied.

The Commissioner concluded that the lease sale is consistent with both the state standards in the ACMP and the proposed [6] North Slope Borough coastal management program. However, since the Commissioner's consistency determination with regard to the state standards is stated in a conclusory manner, it is unclear which of the two methods stated in the preceding paragraph the Commissioner used in making the consistency determination.

As a result, this case must be remanded to the Commissioner with instructions to reconsider his decision and to determine whether the specific environmental protections encompassed in 6 AAC 80.040–.120 have been met.[7] If the Commissioner determines that these regulations have not been met, the Commissioner should make specific findings with respect to whether the requirements of 6 AAC 80.130(d) are satisfied.[8]

6. The plaintiffs and Kaktovik claim that the Commissioner's consistency determination with regard to the proposed North Slope plan does not satisfy the ACMP requirement that a state agency make a consistency determination for "applicable district programs" since the proposed plan was ultimately rejected by the Alaska Coastal Management Council. However, the Council rejected the plan because its proposals were more stringent than the standards in the ACMP and thus unreasonably restricted oil and gas activities. If the Commissioner found that the lease sale was consistent with an overly restrictive plan, he would certainly have found that the lease sale was consistent with a less restrictive plan.

7. In order for a court to review the consistency "finding" of the Commissioner required by the ACMP, the Commissioner must at a minimum establish a record which reflects the basis for his decision. *Moore v. State*, 553 P.2d 8, 36 (Alaska 1976). The plaintiffs argue that the Commissioner must not only establish such a record, but must also submit adequate written findings and reasons explaining his consistency determination in order to facilitate the process of judicial review.

Courts have frequently required findings and reasons to be provided by administrative agencies for formal proceedings which are judicially reviewable. These findings and reasons have been required on the common law basis of needs of judicial review. 3 K. Davis, Administrative Law Treatise § 14.22, at 104 (2d ed. 1980). As stated by the United States Supreme Court "[w]e must know what a decision means before the duty becomes ours to say whether it

is right or wrong." *Secretary of Agriculture v. United States*, 347 U.S. 645, 654, 74 S.Ct. 826, 832, 98 L.Ed. 1015 (1954) (quoting *United States v. Chicago M., St. P. & P.R. Co.*, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935)); *accord, S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). However, the courts have been more hesitant in requiring findings and reasons to support informal administrative actions absent an express statutory requirement. *Moore v. State*, 553 P.2d 8 (Alaska 1976) and *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) are two cases which illustrate this hesitancy. Both decisions stop short of requiring findings and reasons to be articulated by the decisionmaker. *Moore v. State*, 553 P.2d at 36; *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 417, 91 S.Ct. at 824, 28 L.Ed.2d at 154. *Moore*, however, does require "a record which *reflects the basis* for [the administrator's] decision." 553 P.2d at 36 (emphasis added) (footnote omitted). If the reviewing court cannot divine the basis for the decision from a bulky record, this language clearly leaves the door open for the requiring of findings under common law as a basis for reviewability. *See Mobil Oil Corp. v. Local Boundary Comm'n*, 518 P.2d 92, 97 n.11 (Alaska 1974).

8. Whether the Office of Coastal Management complied with the ACMP is a spurious issue with regard to the lease sale. Unlike the ACMP requirement that the Commissioner "find" consistency, the ACMP only requires that the Office of Coastal Management "re-

III. The Marine Mammal Protection Act and the Endangered Species Act

■ Kaktovik contends that any development of the land leased by the state violates the Marine Mammal Protection Act (MMPA), 16 U.S.C. §§ 1361–1407 (1976), and the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1543 (1976). The superior court ruled that the plaintiff-intervenors were collaterally estopped from relitigating these claims upon the ground that they were adjudicated in the parallel federal litigation, *North Slope Borough v. Andrus*, 486 F.Supp. 332 (D.D.C.1980), *aff'd and rev'd in part, North Slope Borough v. Andrus*, 642 F.2d 589 (D.C.Cir.1980). Alternatively, the superior court held that, even if Kaktovik was not collaterally estopped from relitigating the federal claims, no violation of the federal acts occurred.

These claims are essentially identical to those argued in the federal case. There the United States Court of Appeals, District of Columbia Circuit, held that there was no violation of the federal acts with regard to the federal portion of the Beaufort Sea lease sale. 642 F.2d at 607–14. For the same reasons, we hold likewise in the case at bar.[9]

IV. Bidding Methods

The plaintiffs first attack the Commissioner's choice of bidding methods on procedural grounds. They contend that the written best interests decision required by AS 38.05.035(a)(14) must include adequate findings on the specific bidding methods chosen by the Commissioner, and that the Commissioner's findings are deficient in this respect. Alternatively, the plaintiffs contend that such findings are necessary for the court to use the reasonable basis test[10] to review the Commissioner's bidding methods under AS 38.05.180(f) (1981 Cum.Supp.).

AS 38.05.180(f) requires the Commissioner to use bidding procedures that are in the state's best interests. The Commissioner is guided by the factors listed in AS 38.05.180(a)(1):

[T]he people of Alaska have an interest in the development of the state's oil and gas resources to

(A) maximize the economic and physical recovery of the resources;

(B) maximize competition among parties seeking to explore and develop the resources;

(C) maximize use of Alaska's human resources in the development of the resources.

The superior court rejected the plaintiffs' contention that AS 38.05.035(a)(14) requires specific findings on the Commissioner's bidding methods, and also held that there is a sufficient record to review the Commissioner's decision.

The plaintiffs also challenge the substantive validity of the Commissioner's decision to employ the cash bonus/sliding scale royalty method on the disputed Dinkum Sands tracts. The superior court found that the Commissioner had a reasonable basis for utilizing this method.

A. *Is the Commissioner's decision procedurally deficient?*

■ Even if AS 38.05.035(a)(14) requires the Commissioner to include adequate findings on the bidding methods in his best interests decision, it is clear the Commissioner has complied. In his decision document there is a fifteen page discussion of the bidding methods. The Commissioner relied on over twenty extensive presale economic analyses of bidding methods prepared by state agencies and legislative committees, public interest groups, U. S. agencies, oil companies, and university professors of

view" state and federal actions for consistency with the ACMP. The record establishes that such a review was made.

**9.** This conclusion makes it unnecessary for us to address the question of whether the superior court erred in holding that Kaktovik was collaterally estopped from relitigating these issues.

**10.** In *Kelly v. Zamarello*, 486 P.2d 906, 912 (Alaska 1971), this court held that the reasonable basis test was the proper standard of review for AS 38.05.180(a).

economics and business. These studies discuss the utility of various bidding methods under different assumptions concerning future oil prices, costs of exploration and production, and especially the expected field sizes. The Commissioner's knowledge of expected field sizes was derived from geological reports that must be kept confidential[11] pursuant to AS 31.05.035(c) and AS 38.05.035(a)(9).

In addition to these studies, the Commissioner considered eighteen other factors such as the number of bidders, the division of risk between lessees and the state, and development efficiency. In *Kelly v. Zamarello*, 486 P.2d 906, 912–13 (Alaska 1971), this court acknowledged the complexity of the bidding method determination and the necessity of the Commissioner to "evaluate a number of imponderables within his field of expertise."

B. *Is the Bidding Method for the Dinkum Sands Tracts Substantively Valid?*

■ The plaintiffs contend that the use of the cash bonus/sliding scale royalty method for the disputed Dinkum Sands tracts does not achieve the objectives found in AS 38.05.180(a)(1) and is thus unreasonable. More specifically, the plaintiffs claim that this bidding method will not maximize economic return to the state. They cite several studies showing that the cash bonus/sliding scale royalty method will maximize economic return to the state only if there are not high quantities of oil in the land. Considering the extremely high bids for the Dinkum Sands tracts and other evidence of commercial quantities of oil in those tracts, the plaintiffs conclude that the Commissioner's choice was inappropriate.

The plaintiffs' argument is untenable. First, this court must review the Commissioner's decision at the time it was made and avoid any postsale analysis. Second, the plaintiffs ignore the studies that strongly support the Commissioner's selection, and they did not have access to the confidential

information at the Commissioner's disposal. Finally, the Commissioner had to come to an agreement with the United States on the bidding method for the disputed tracts or not lease the land at all until the title dispute was settled. As the state correctly points out, the maximization of economic recovery is only one of the objectives found in AS 38.05.180(a)(1) and must be balanced against the statute's other objectives.

V. The Alaska Public Meetings Act

The superior court ruled that both the Agency Advisory Committee on Leasing (AACL) and the Joint Federal/State Beaufort Sea Task Force (Task Force) were within the purview of the Alaska Public Meetings Act, and that their actions violated the reasonable notice requirement of the Act. Those requirements are as follows:

(a) All meetings of a legislative body, of a board of regents, or of an administrative body, board, commission, committee, subcommittee, authority, council, agency, or other organization, including subordinate units of the above groups, of the state or any of its political subdivisions, including but not limited to municipalities, boroughs, school boards, and all other boards, agencies, assemblies, councils, departments, divisions, bureaus, commissions or organizations, *advisory or otherwise*, of the state or local government supported in whole or in part by public money or authorized to spend public money, are open to the public except as otherwise provided in this section . . . .

. . . .

(e) Reasonable public notice shall be given for all meetings required to be open under this section.

(f) *Action taken contrary to this section is void.*

AS 44.62.310 (emphasis added).

The superior court further held, however, that such violations did not require it to void the lease sale, citing two reasons: first, the court found that it was not the decision

---

**11.** The lessees contend that the disclosure of the confidential information would destroy the competitive nature of the sale. This contention is supported by the record.

of the AACL or the Task Force to lease the land, but rather that of the Commissioner; second, the court found that the record "reflects that there was opportunity for substantial public input at all stages leading up to the Commissioner's decision, and in fact there was substantial public input." Thus, the court concluded that the violation was harmless and that any ruling should be prospective.

The state and lessees do not object to the court's final conclusion, but contend that the advisory committees were not within the purview of the Act, and, even if they were, the committees complied with the reasonable notice requirement of the Act. Kaktovik claims that the violation was not harmless.

### A. Are the AACL and the Task Force Within the Purview of the Act, and if so, were the Reasonable Notice Requirements Satisfied?

■ The state's claim that the AACL was not empowered to address the lease sale, and that the Task Force did not have important responsibilities, is in conflict with the record. According to Commissioner LeResche and Thomas Cook, the director of the Division of Minerals and Energy Management, the AACL was originally founded to formulate the mitigating measures for another lease sale, but later was given part of the responsibility, along with the Task Force, to formulate mitigating measures and stipulations for the Beaufort Sea lease sale. Thus, it appears that the AACL and the Task Force were "advisory" committees within the meaning of the Public Meetings Act.

The state also contends that by including a representative from the North Slope Borough on the AACL, adequate public notice was given. However, according to an affidavit given by that representative, he did not give notice of the AACL meetings to the villages of Kaktovik, Nuiqsut or Barrow. Of the numerous meetings held by these committees, notice was given in only several instances.[12]

### B. Was the Violation Harmless?

■ Kaktovik argues that it does not matter that the ultimate decision to lease the land was made by the Commissioner. The Act should be read to "void a decision based upon the work of an advisory committee." Furthermore, Kaktovik claims that the Commissioner was not truly independent from the AACL in light of the fact that he was co-chairman of that committee. Thus, considering the strong public policy behind the Public Meetings Act,[13] the Commissioner's decision should be struck down.

Kaktovik's claim that the Commissioner's decision was not made independently from the AACL and the Task Force is refuted by the record.[14] The Commissioner received

---

**12.** However, as the state points out, it is arguable that a strict public notice requirement applied to every meeting of advisory committees such as these would interfere with the administrative process. The legislative history is silent on this point.

**13.** AS 44.62.312 provides in pertinent part:

(1) the governmental units mentioned in AS 44.62.310(a) exist to aid in the conduct of the people's business;

(2) it is the intent of the law that actions of those units be taken openly and that their deliberations be conducted openly;

(3) the people of this state do not yield their sovereignty to the agencies which serve them;

(4) the people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know;

(5) the people's right to remain informed shall be protected so that they may retain control over the instruments they have created.

**14.** The fact that there is evidence indicating the Commissioner made his decision independently of the advisory committees distinguishes this case from *Town of Palm Beach v. Gradison*, 296 So.2d 473 (Fla.1974).

In *Gradison*, the town council appointed a citizen's planning committee to advise the council on the formulation of zoning ordinances. Although the council held a public meeting to announce their final decision, the court held that since the advisory meetings were closed to the public and in violation of the Public Meetings Act, the adopted zoning ordinance was void. However, in a later decision, the court clarified the *Gradison* case, stating that the council in *Gradison* approved the ad-

advice and studies from various state biological resource agencies as well as from OCSEAP scientists regarding possible mitigating measures and stipulations for the lease sale.

The record also supports the superior court's conclusion that there was opportunity for substantial public input concerning the lease sale, and in fact there was such input. In March 1976, the state held the first public hearings regarding the Beaufort Sea lease sale. On March 3, 1978, a call for nominations for the proposed lease sale was issued ·in the Federal Register. Nominations and comments were requested and received from the North Slope Borough, Kaktovik and Nuiqsut, concerning which tracts should not be included in the sale. Following the call for nominations, a formal tract selection meeting was held in Washington, D. C., on June 13, 1978, which included representatives from the North Slope Borough.

In May and June of 1979 the AACL held public hearings in Barrow, Nuiqsut, and Kaktovik to solicit comments from officials and residents regarding the DEIS and especially the proposed lease stipulations. Prior to the issuance of the JF/SID, the Division of Minerals and Energy Management met with representatives of the North Slope Borough on October 16, 1979 to discuss the content of that document. Finally, more than 100 written comments were received as a result of solicitation by news releases,

federal register notices, and distribution of the DEIS.

Accordingly, we affirm the superior court's ruling that there was insufficient ground upon which to hold the Commissioner's decision void.

## VI. Is The United States an Indispensable Party?

 The state and the United States contend that the superior court erred in finding that the United States was not an indispensable party.[15] Since the relief given by the superior court covers tracts whose ownership is disputed by the State of Alaska and the United States, the latter claims its interests are adversely affected. Since the superior court did not tailor its relief to protect the absent party, and considering that it could not be joined because of sovereign immunity, the United States claims it should have been considered indispensable.

In *State, Department of Highways v. Crosby*, 410 P.2d 724 (Alaska 1966), this court elucidated the test for determining when a party is indispensable:

An indispensable party is one whose interest in the controversy before the court is such that the court cannot render an equitable judgment without having jurisdiction over such party. The determination of indispensability or lack of it involves a discretionary balancing of interests. On the one hand, consideration must be given to the possibility of render-

---

visory committee's recommendation in a "purely ceremonial public meeting." *See Occidental Chem. Co. v. Mayo,* 351 So.2d 336, 342 (Fla. 1977). Furthermore, *Gradison* did not involve the overall public input discussed in the following section.

**15.** Alaska Rule of Civil Procedure 19 provides in pertinent part:

Rule 19. Joinder of Persons Needed for Just Adjudication.

(a) Persons to Be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction . . . shall be joined . . . if . . . (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest. . . .

(b) Determination by Court Whenever Joinder Not Feasible. If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

ing a judgment that will have an adverse factual effect on the interests of persons not before the court, and to the danger of inconsistent decisions, the desire to avoid a multiplicity of actions, and a reluctance to enter a judgment that will not end the litigation. On the other hand, consideration must be given to the desirability of having some adjudication if at all possible rather than none, leaving the parties before the court without a remedy because of an "ideal desire to have all interested parties before the court." Courts exist for the determination of disputes, and they have an obligation in particular litigation to make meaningful determinations if at all possible.

*Id.* at 725–26 (footnotes omitted).

We are not convinced that under the foregoing test the United States is an indispensable party in the case at bar. The federal and state cases that have determined the United States to be an indispensable party involve actions to quiet title or rest on the finding that the United States *already* has a vested ownership interest in the property at issue.[16] It seems absurd to say that the United States' interest in land which may or may not belong to it outweighs the interest of the parties in having adjudicated the important issues in this case.

For the reason stated in part II of our opinion, this matter must be remanded to the Commissioner of Natural Resources for further consideration of his decision in light of the requirements of 6 AAC 80.040–.120. Otherwise, the Commissioner's decision should be affirmed.

AFFIRMED in part, REVERSED in part, REMANDED for further proceedings consistent with this opinion.

CONNOR, Justice, concurring in part, dissenting in part.

I agree with the court's opinion except Part II, which concerns the Alaska Coastal Management Act, AS 46.40.

I think that the Commissioner's general conclusion that the lease sale was consistent with the statute and the proposed local plan is sufficient where, as here, it is apparent that he considered a vast amount of material in connection with his determination that it was in the best interest of the state to lease the lands in question. In my opinion, the Commissioner's general conclusion amounts to the finding required by 6 AAC 80.010(b).

Thus I would affirm the Commissioner of Natural Resources in all respects.

---

16. *See, e.g., Carlson v. Tulalip Tribes of Washington,* 510 F.2d 1337, 1339 (9th Cir. 1975); *New Haven Pub. Schools v. General Serv. Admin.,* 214 F.2d 592, 593 (7th Cir. 1954); *City of Fairbanks v. Electric Distribution Sys.,* 413 P.2d 165, 167 (Alaska 1966); *accord,* 3A J. Moore & J. Lucas, Moore's Federal Practice ¶ 19.15, at 19–294 (2d ed. 1978).